# United States Court of Appeals
## For the First Circuit

Nos. 03-1999, 03-2069

ALBERT JOHNSON,

Plaintiff, Appellee/Cross-Appellant,

v.

SPENCER PRESS OF MAINE, INC.,

Defendant, Appellant/Cross-Appellee,

SPENCER PRESS, INC.,

Defendant.

APPEALS FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MAINE

[Hon. D. Brock Hornby, U.S. District Judge]

Before

Lynch, Circuit Judge,
Cyr, Senior Circuit Judge,
and Howard, Circuit Judge.

U. Charles Remmel, II, with whom Jennifer A. Archer and Kelly, Remmel & Zimmerman were on brief, for appellant/cross-appellee.
Eric J. Uhl, with whom Moon, Moss, McGill & Shapiro, P.A. was on brief, for appellee/cross-appellant.

April 16, 2004

**LYNCH, <u>Circuit Judge</u>**.  These are cross-appeals in a Title VII religious discrimination case.  A jury found Spencer Press of Maine liable for the harassment of its employee Albert Johnson on account of his religion and awarded compensatory and punitive damages, respectively $400,000 and $750,000, the sum of which was reduced to the statutory cap of $300,000.  42 U.S.C. § 1981a(b)(3)(D); Me. Rev. Stat. Ann. tit. 5, § 4613(2)(B)(8)(e)(iv).  Johnson was repeatedly harassed over the course of his nine-year employment in Spencer Press's janitorial department by his supervisor, Steven Halasz.

Spencer Press appeals from the denial of its new trial motion, arguing that the evidence did not show that the harassment was because of Johnson's religion and did not show that it was severe and pervasive.  Spencer Press also challenges the punitive damages award and the jury instructions.  We reject these contentions and affirm.

Johnson cross-appeals the district court's holding that he was not entitled to any back pay or front pay after he was fired from his next job, after leaving Spencer Press, for misconduct.  He also argues that the district court erred in rejecting the contention that he was unable to get a subsequent job because he was psychologically disabled, and that Spencer Press is responsible for this disability because it stems from the harassment he endured while he was an employee there.

We affirm the limitation on Johnson's front pay and back pay, but we do so on alternative grounds. We hold that it is error to cut off, as a matter of law, the ability of a successful Title VII plaintiff to receive further back pay or front pay once he is fired for misconduct from the position he takes after leaving the discriminatory employer. As a result, we reach a second issue on which Johnson's cross-appeal ultimately fails; Johnson was unable to work because he was totally disabled and the evidence was insufficient to support Johnson's claim that this disability was attributable to the harassment he endured at Spencer Press. We affirm.

## I.

On April 3, 2002, plaintiff Albert Johnson filed suit against his former employer, Spencer Press of Maine, Inc.,[1] alleging that he had been discriminated against and harassed on the basis of, inter alia,[2] his religion in violation of Title VII of

---

[1]Johnson also sued Spencer Press, Inc., the parent corporation of Spencer Press of Maine, Inc. The district court granted summary judgment to Spencer Press, Inc., and Johnson has not appealed that decision. All references in this opinion to Spencer Press refer to Spencer Press of Maine.

[2]Johnson also alleged that he had been the victim of unlawful discrimination on the basis of a disability and that he had been unlawfully retaliated against for invoking his rights. The district court granted summary judgment to Spencer Press on the disability discrimination claim, and Johnson does not appeal that determination. The district court did not grant summary judgment to Spencer Press on the retaliation claim, but, based on the jury's verdict, judgment was entered against Johnson on this claim and Johnson also does not appeal this determination.

the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e et seq., and the Maine Human Rights Act, Me. Rev. Stat. Ann. tit. 5, § 4551 et seq. (West 2002).[3]  The complaint sought all available forms of relief, including compensatory and punitive damages and front and back pay.  Spencer Press promptly moved for summary judgment on these claims.  The district court denied the motions as to Johnson's underlying discrimination and harassment claims and as to the availability of punitive damages, but held, as a matter of law, that Johnson was not entitled to any front pay or back pay for any time after December 8, 2000.  Johnson was fired for misconduct on that date from Hannaford Brothers, his employer immediately after he left Spencer Press.

The case proceeded to trial before a jury on April 28, 2003 and lasted four days.  The testimony presented at trial, which is recounted in the light most favorable to Johnson, O'Rourke v. City of Providence, 235 F.3d 713, 717 (1st Cir. 2001), established the following account.

Johnson received a B.S. in Bible Studies from Valley Forge Christian College in 1978 and served as a pastor at the Beech Ridge Assembly of God Church from May 1979 to October 1981.  In 1981, Johnson resigned from his position at the church and found a new job at the Paul Dever State School for the mentally retarded,

_____

[3]The parties have not argued that there are material differences between Title VII and the Maine statute.

which he stayed in until July 1990. Despite leaving his official position at the church, Johnson remained very active in religious activities.

In November of 1991, Johnson began working as a custodian at Spencer Press, a printing company. After Johnson started at Spencer Press, he expressed to both his supervisor at the time and his co-workers a desire to have Sundays off from work. Although Johnson had to work most Sundays, his first few months at Spencer Press were incident-free.

Stephen Halasz became the supervisor of the custodial department at Spencer Press in May of 1992. Some time shortly thereafter, Johnson expressed to Halasz a desire to have Sundays off, if possible. Johnson had also had discussions with co-workers in which he revealed his religious beliefs. Starting either in late 1992 or early 1993, Halasz began asking Johnson about his religious views. Halasz testified that he understood the reason that Johnson did not like to work on Sundays was because he wanted to go to church. Halasz also testified that he was aware that Johnson was religious before he found out in 1995 that Johnson used to be a minister.

Soon after Halasz was promoted to the position of supervisor, he started making inappropriate and lewd comments to Johnson. Johnson recounted one incident in late 1992 in which Halasz told him to "help hold my dick" and another incident in

which Halasz said Johnson looked tired and told a co-worker that "if Al fucks like he works, then he must be slow as a nigger." Halasz made multiple other inappropriate and sexually explicit comments to Johnson throughout 1992 and 1993.

At least two of these remarks specifically targeted Johnson's religious beliefs. At one point, Halasz tried to show Johnson a Playboy magazine and said that he "must be Catholic" because he got flustered whenever Halasz made comments about sex. Johnson said that on another occasion in 1992, Halasz proclaimed to another custodian that "Al doesn't fuck, drink or smoke, he must be a Catholic." Halasz admitted to making derogatory remarks to Johnson and teasing him for being Catholic. He also said that he remembered calling Johnson a Catholic when he refused to look at a Playboy magazine.

Upset by Halasz's treatment of him, Johnson started in 1994 to keep notes of "significant" events that he considered "hostile or demeaning." Johnson kept notes of numerous instances of harassment by Halasz that occurred from 1992 until May 2000, when Johnson left Spencer Press. These included Halasz's comments that Johnson should suck Halasz's dick, that Halasz hoped a deer would "run[] out of the woods and suck[] [his] cock," and that Johnson should give his boss a "blow job." Halasz did not make comments like these to any of the other custodians at Spencer Press. One of Johnson's former co-workers, Patrick Hubbard,

confirmed that Halasz consistently and frequently called Johnson names such as "fucking queer," "fucking cock sucker," and "fucking lazy." Hubbard testified that he never heard Halasz call any other workers by these names.

A significant percentage of the derogatory comments that Halasz made from 1994 to 2000 involved Johnson's religion. Halasz called Johnson a "religious freak" and told Johnson that he was tired of his "religious bullshit." According to Johnson, Halasz told him that because of his religious beliefs he "wasn't out basically getting pussy." On April 27, 2000, a day before Johnson tendered his resignation to Spencer Press, Halasz told Johnson that "he was getting real tired of hearing that [Johnson] couldn't work overtime on Sundays, that [he] was involved in church and classes, and [that Halasz] didn't like it." Halasz then asked Johnson "if you could work overtime . . . and make $120 or love Jesus, what would you do?" When Johnson answered that he would love Jesus, Halasz screamed "well, why don't you take Mary and turn her upside down and pull her dress over her head."

Halasz's derogatory remarks involving religion were also corroborated by the testimony of Johnson's former co-worker. Karen Hart, who worked with Johnson as a custodian in 1999, testified that Halasz harassed Johnson about his religion and called him a "religious freak." Hart recalled Halasz telling Johnson that "I don't want to hear about your religious bullshit" and, on another

occasion, that he should "go work with people that are Jehovah Witnesses and keep your comments to yourself [because] I don't want to hear about the religious stuff." Halasz also told Johnson that Johnson's job was more important than his church affairs. Halasz made these comments, according to Hart, "on a daily basis" while she was working at Spencer Press. Hart testified that she was so distraught by these comments that she told Halasz that he "shouldn't be harassing [Johnson] about his religion."

Johnson's testimony that Halasz consistently harassed him about his religious beliefs was also corroborated by Norma Crawford, a friend of Johnson. Crawford testified that Johnson frequently called her from work when he was upset and told her that he was being harassed at work because of his religion. On several of these occasions, according to Crawford, Johnson was crying when he called her. Crawford testified that Johnson told her about Halasz's comment regarding the Virgin Mary.

Johnson also testified about several instances in which Halasz threatened to kill him with a hand grenade, run him over with a car, and shoot him with a bow and arrow. At one point, Halasz took a knife out of its sheath and put the point of it under Johnson's chin.

Johnson complained to the human resources department about the treatment he was receiving from Halasz about six different times over the course of his employment. Each time, he

was told that there was nothing that could be done and, that if he did not like the treatment he was receiving, he could leave the company. At one point, the human resources person to whom Johnson complained told him that she could not pursue his complaints about Halasz because if she did she would be fired. Johnson also filed several requests to transfer into another division within Spencer Press, each of which was denied.

On April 28, 2000, Halasz resigned his position from Spencer Press. He had been experiencing frequent panic attacks at work, and at one point he had needed to be taken to the hospital in an ambulance as a result of a panic attack. He also had suffered from severe depression. On May 2, he began another job at Hannaford Brothers, a supermarket chain.

Johnson subsequently filed a complaint with the Maine Human Rights Commission and the Equal Employment Opportunity Commission. After Johnson filed these complaints, Halasz came to Johnson's house and threatened to beat him up if he maintained his complaints. He also told Johnson that as a result of the complaints, he had been forced to take harassment classes at Spencer Press and that he had learned that he had discriminated against Johnson on the basis of his religion.

On May 1, 2003, a jury returned a verdict in which it concluded that Spencer Press harassed Johnson because of his religion or religious beliefs and that Johnson was constructively

discharged from Spencer Press because of that harassment.  The jury also found that Spencer Press had not independently taken any specific adverse employment action against Johnson on the basis of his religion.  The jury awarded Johnson $400,000 in compensatory damages and $750,000 in punitive damages.  Spencer Press did not file a Rule 50 motion for judgment as a matter of law.

Spencer Press did move for a new trial pursuant to Fed. R. Civ. Proc. 59, arguing that there was insufficient evidence to support the jury's verdict.  That motion was denied, and judgment was entered in favor of Johnson on the harassment claim.  Pursuant to 42 U.S.C. § 1981a(b)(3)(D), the sum of compensatory and punitive damages was capped at $300,000.  Johnson was also awarded $1,227.94 in back pay, which represented Johnson's wage loss between May 2, 2000 and December 8, 2000, the period he was employed at Hannaford Brothers.

Spencer Press appeals both the district court's denial of its motion for a new trial and the underlying judgment.  Johnson cross-appeals the district court's ruling limiting the availability of front and back pay.

## II. Direct Appeal

A. <u>Denial of Spencer Press's Motion for a New Trial</u>

We review the district court's denial of Spencer Press's motion for a new trial for an abuse of discretion.[4] <u>Marrero</u> v. <u>Goya of P.R., Inc.</u>, 304 F.3d 7, 14 (1st Cir. 2002). In doing so, we recognize that motions for a new trial are generally "directed to the trial court's discretion and th[e] remedy is sparingly used." <u>Dall</u> v. <u>Coffin</u>, 970 F.2d 964, 969 (1st Cir. 1992) (internal quotation marks omitted). A district court should only grant such motions if "the outcome is against the clear weight of the evidence such that upholding the verdict will result in a miscarriage of justice." <u>Ramos</u> v. <u>Davis & Geck, Inc.</u>, 167 F.3d 727, 731 (1st Cir. 1999) (internal quotation marks omitted).

The jury found in favor of Johnson on his workplace harassment claim based on religion. Spencer Press argues that there was no causal link to religion and that the harassment was not severe and pervasive. To prevail on a harassment claim based

---

[4]Spencer Press argues in its opening brief that it is also appealing the district court's refusal to grant judgment as a matter of law, and that this holding should be reviewed de novo. But after the jury reached its verdict, Spencer Press filed only a motion for a new trial under Rule 59, and not for a judgment as a matter of law under Rule 50(b). Accordingly, Spencer Press has waived its earlier motion for judgment as a matter of law and is not entitled to appellate review on the issue. <u>See</u> <u>Cambridge Plating Co.</u> v. <u>Napco, Inc.</u>, 85 F.3d 752, 759 (1st Cir. 1996); <u>Pinkham</u> v. <u>Burgess</u>, 933 F.2d 1066, 1070 (1st Cir. 1991). Even so, we observe that an objectively reasonable jury could easily have reached the result here.

on a supervisor's conduct, Johnson needed to carry his burden that: (1) he was a member of a protected class; (2) he was subject to uninvited harassment; (3) the offending conduct was because of his religion; (4) the harassment was sufficiently severe or pervasive to affect the terms and conditions of employment; (5) the offending conduct was both objectively and subjectively offensive; and (6) there was a basis for employer liability. Rivera v. P.R. Aqueduct & Sewers Auth., 331 F.3d 183, 189 (1st Cir. 2003); O'Rourke, 235 F.3d at 728. Spencer Press argues that the jury's conclusion in favor of Johnson was against the clear weight of the evidence on both prongs (3) and (4).

In advancing the claim that any harassment was not due to religion, Spencer Press relies heavily on Rivera, in which we noted a "conceptual gap between an environment that is offensive to a person of strong religious sensibilities and an environment that is offensive because of hostility to the religion guiding those sensibilities." 331 F.3d at 190.[5] Although Spencer Press admits that there may have been several isolated incidents in which the harassment manifested itself in comments implicating religion, it

_____

[5]Rivera upheld an award of summary judgment to the employer on de novo review. 331 F.3d at 185. Had Spencer Press moved for judgment as a matter of law under Rule 50, the same standard of review would apply. See Reeves v. Sanderson Plumbing Prods. Inc., 530 U.S. 133, 150 (2000). Here, by contrast, the denial of Spencer Press's motion for a new trial under Rule 59 must meet the more difficult standard of abuse of discretion. See supra.

argues that this was not sufficient for the jury to conclude that Johnson was harassed <u>because of</u> his religion.

The district court did not abuse its discretion in declining to grant a new trial. Soon after Halasz was promoted to custodial supervisor, he became aware that Johnson was a religious person. At approximately the same time, he started making extremely inappropriate and lewd comments to Johnson. At first, only some of these remarks explicitly targeted Johnson's religion: Halasz repeatedly said that Johnson "must be Catholic" because he did not want to do certain things. Gradually, though, the harassment came to focus unabashedly on Johnson's religious views. Halasz repeatedly called Johnson a "religious freak," told him not to talk about "religious bullshit," said that because of his religion he was not getting sex, and told him to "take [the Virgin] Mary and turn her upside down and pull her dress over her head."

Almost all of the inappropriate comments concerning Johnson's religion focused on a consistent theme: that Johnson was too chaste and sober for Halasz's taste and that this was because of Johnson's religious beliefs. Halasz did not make similarly inappropriate and offensive comments to other Spencer Press employees. Given the consistency of the harassment that specifically invoked Johnson's religion and the more frequent harassment that did not, the jury could easily have concluded that the underlying motivation -- religious discrimination -- was the

same for each. The jury also could have easily concluded that this motivation stemmed from Halasz's animosity towards Johnson's religious beliefs; indeed, Halasz explicitly attributed Johnson's chastity and sobriety to his religious convictions. As explained in Rivera, "conduct need not be explicitly religious to constitute harassment because of religion." 331 F.3d at 190 n.2; see Venters v. City of Delphi, 123 F.3d 956, 973 (7th Cir. 1997) (religious harassment can be established through indirect comments that are not on their face about religion); cf. Landrau-Romero v. Banco Popular de Puerto Rico, 212 F.3d 607, 614 (1st Cir. 2000) ("Alleged conduct that is not explicitly racial in nature may, in appropriate circumstances, be considered along with more overtly discriminatory conduct in assessing a Title VII harassment claim.").

For similar reasons, we reject Spencer Press's argument that it was against the clear weight of the evidence for the jury to find that the harassment endured by Johnson was sufficiently "severe or pervasive" to affect a "term, condition, or privilege of employment." Meritor Sav. Bank, FSB v. Vinson, 477 U.S. 57, 67 (1986). Whether the harassment was severe or pervasive "must be answered by reference to 'all the circumstances,' including the 'frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'" Marrero v. Goya of Puerto Rico,

-14-

Inc., 304 F.3d 7, 18 (1st Cir. 2002) (quoting Harris v. Forklift Sys., Inc., 510 U.S. 17, 23 (1993)). "Subject to some policing at the outer bounds, it is for the jury to weigh those factors and decide whether the harassment was of a kind or to a degree that a reasonable person would have felt that it affected the conditions of her employment." Id. (internal quotation marks omitted).

The description of facts set forth earlier provides more than ample support for the jury's conclusion. Halasz repeatedly and continuously insulted Johnson and mocked his religious convictions. The harassment occurred throughout Johnson's work day, including when he was attempting to perform his custodial duties. On multiple occasions, Halasz threatened Johnson with violence and once he actually placed the point of a knife under Johnson's chin. In sum, there was more than ample evidence to support the jury's conclusion that the harassment was severe and pervasive. See White v. N.H. Dep't of Corr., 221 F.3d 254, 260-61 (1st Cir. 2000) (finding that "disgusting comments" and conversations that occurred "everyday" could support a finding that harassment was severe and pervasive).

B. Spencer Press's Challenge to the Punitive Damages Award

Spencer Press argues that the jury did not have sufficient evidence to award punitive damages because Halasz was not acting "in a managerial capacity" during the course of Johnson's employment. Kolstad v. Am. Dental Ass'n, 527 U.S. 526,

-15-

545-46 (1999). Spencer Press admits that the jury rationally could have rejected its affirmative defense to an award of punitive damages that it had exercised reasonable care to avoid harassment and to eliminate it when it might occur. Id. at 545.

The availability of punitive damages is not a live issue. The jury awarded Johnson $400,000 in compensatory damages and $750,000 in punitive damages. Acting pursuant to 42 U.S.C. § 1981a(b)(3)(D) and Me. Rev. Stat. Ann. tit. 5, § 4613(2)(B)(8)(e)(iv), both of which cap the sum of punitive and compensatory damages for employers with over 500 employees, the district court entered judgment for Johnson for $300,000.[6] Because the compensatory damages award was itself greater than the statutory cap, the award would have been the same regardless of whether the jury awarded any punitive damages. See Quint v. A.E. Staley Mfg. Co., 172 F.3d 1, 14 (1st Cir. 1999) (declining to address whether a compensatory damages award was excessive because the award of punitive damages exceeded the statutory cap); Hogan v. Bangor & Aroostook R.R. Co., 61 F.3d 1034, 1037 (1st Cir. 1995) (avoiding the issue of punitive damages because the jury's award of compensatory damages was the same as the statutory cap).

C.  Spencer Press's Challenge to the Jury Instructions on the Severe or Pervasive Requirement

---

[6]This amount did not include the district court's additional award to Johnson of $1,227.94 in back pay.

Spencer Press argues that the district court erred in its explanation to the jury of the requirement that the harassment be "severe or pervasive." Spencer Press preserved the objection.

The district court instructed the jury that, to succeed on his harassment claim, Johnson must show:

> that the harassment was sufficiently severe or pervasive so as to alter the conditions of his employment and create an abusive working environment. . . .
>    Religiously discriminatory remarks, innuendos, ridicule, and intimidation can be sufficiently severe or pervasive in their accumulated effect to alter the conditions of employment and create an abusive working environment. But offhand comments, rudeness, occasional teasing and isolated incidents are not alone sufficient. This is not a general civility code for the workplace.

Spencer Press's argument is that this instruction was flawed because it did not include a statement that the conduct must be "extreme." This argument is premised on the Supreme Court's statement in Faragher that "conduct must be extreme to amount to a change in the terms and conditions of employment." 524 U.S. at 788 (emphasis added).

We review the district court's choice of language in instructing the jury for an abuse of discretion. Gray v. Genlyte Group, Inc., 289 F.3d 128, 133 (1st Cir. 2002). The district court did not abuse its discretion in omitting the word "extreme" from its instructions to the jury. It is the district court's prerogative to craft the "particular verbiage" that it will use in its jury instructions. Febres v. Challenger Caribbean Corp., 214

-17-

F.3d 57, 62 (1st Cir. 2000).  So long as that language properly explains the controlling legal standards and is not unduly confusing or misleading, it will not be second-guessed on appeal. See id.; Brown v. Trustees of Boston Univ., 891 F.2d 337, 353 (1st Cir. 1989); see also Webster's Third New International Dictionary 807 (1993) (one definition of "extreme" is "marked by great severity").  There is no requirement that the word "extreme" be used in instructing the jury on a harassment claim.

### III. Johnson's Cross-Appeal Regarding Damages

Johnson cross-appeals the district court's summary judgment and post-trial determinations that, as a matter of law, he is not entitled to any back pay or front pay for any period beyond December 8, 2000.  Spencer Press raises no questions about Johnson's preservation of these issues for appeal.

The availability of back pay and front pay is not affected by the cap on compensatory and punitive damages.  Both federal and Maine law clearly exclude awards of back pay from the statutory cap on the sum of compensatory and punitive damages.  See 42 U.S.C. § 1981a(b)(2); Me. Rev. Stat. Ann. tit. 5, § 4613(2)(B)(8)(d).  And the Supreme Court has recently clarified that the same rule applies to awards of front pay.  Pollard v. E.I. du Pont de Nemours & Co., 532 U.S. 843, 848 (2001).

An award of back pay compensates plaintiffs for lost wages and benefits between the time of the discharge and the trial

-18-

court judgment. See Lindemann & Grossman, Employment Discrimination Law 635-37 (Cane, Jr. et al. eds., 3d ed. 1996). Front pay, by contrast, is "money awarded for lost compensation during the period between judgment and reinstatement or in lieu of reinstatement." Pollard, 532 U.S. at 846; see Lindemann & Grossman, at 639-42. Front pay thus compensates plaintiffs for lost wages that may accrue after the conclusion of the trial. Both back pay and front pay are authorized by 42 U.S.C. § 2000e-5(g)(1), which provides:

> If the court finds that the respondent has intentionally engaged in or is intentionally engaging in an unlawful employment practice charged in the complaint, the court may . . . order such affirmative action as may be appropriate, which may include, but is not limited to, reinstatement or hiring of employees, with or without back pay (payable by the employer, employment agency, or labor organization, as the case may be, responsible for the unlawful employment practice), or any other equitable relief as the court deems appropriate. Back pay liability shall not accrue from a date more than two years prior to the filing of a charge with the Commission. Interim earnings or amounts earnable with reasonable diligence by the person or persons discriminated against shall operate to reduce the back pay otherwise allowable.

During the back pay period, individuals have an obligation to exercise "reasonable diligence" in finding alternative suitable employment. See 42 U.S.C. § 2000e-5(g)(1); Ford Motor Co. v. EEOC, 458 U.S. 219, 231-32 (1982) (an "unemployed or underemployed claimant, like all other Title VII claimants, is subject to the statutory duty to minimize damages set out in" 42 U.S.C. § 2000e-5(g)(1)); Carey v. Mt. Desert Island Hosp., 156 F.3d

-19-

31, 41 (1st Cir. 1998). Thus, awards of back pay are offset by any wages that could have been earned with reasonable diligence after the illegal discharge, regardless of whether they were actually earned. See § 2000e-5(g)(1); Quinones Candelario v. Postmaster Gen. of United States, 906 F.2d 798, 799-802 (1st Cir. 1990). Failures to mitigate damages can take a variety of forms, including not looking for new employment, see, e.g., Hansard v. Pepsi-Cola Metro. Bottling Co., 865 F.2d 1461, 1468 (5th Cir. 1989), finding new employment but voluntarily quitting, see, e.g., EEOC v. Delight Wholesale Co., 973 F.2d 664, 670 (8th Cir. 1992), or, as in this case, finding new employment and getting discharged for misconduct, see, e.g., Brady v. Thurston Motor Lines, Inc., 753 F.2d 1269, 1277 (4th Cir. 1985).

The Supreme Court laid out the basic standards for awarding back pay in Albemarle Paper Co. v. Moody, 422 U.S. 405 (1975). That opinion clarified that in cases of unlawful discrimination, "back pay should be denied only for reasons which, if applied generally, would not frustrate the central statutory purposes of eradicating discrimination throughout the economy and making persons whole for injuries suffered through past discrimination." Id. at 421. Despite its equitable nature, back pay is therefore "a presumptive entitlement of a plaintiff who successfully prosecutes an employment discrimination case." Thurman v. Yellow Freight Systs., Inc., 90 F.3d 1160, 1171 (6th

-20-

Cir. 1996). In this circuit, juries are generally entrusted with decisions on back pay when the jurors are already resolving issues of liability and compensatory damages.[7] See Santiago-Negron v. Castro-Davila, 865 F.2d 431, 441 (1st Cir. 1989).

Awards of front pay, by contrast, are generally entrusted to the district judge's discretion[8] and are available in a more limited set of circumstances than back pay. See Lussier v. Runyon, 50 F.3d 1103, 1108-09 (1st Cir. 1995). Front pay should not be awarded unless reinstatement is impracticable or impossible. Wildman v. Lerner Stores Corp., 771 F.2d 605, 616 (1st Cir. 1985). Even then, awards of front pay are discretionary, in part because they necessarily involve predictions of events yet to come. See id.; Lussier, 50 F.3d at 1109. For these reasons, district court decisions as to front pay are generally afforded more deference than decisions as to back pay.

The district court ruled that Johnson stopped mitigating his damages about seven months after he left Spencer Press, when he was fired on December 8, 2000 from his subsequent job at Hannaford Brothers, a major supermarket chain in Maine. Johnson had started

---

[7]However, "[w]here only reinstatement and back pay are requested or if they are the only issues, in addition to liability, remaining in the case then both reinstatement and back pay shall be for the court." Santiago-Negron, 865 F.2d at 441.

[8]There is some dispute, which need not concern us, as to whether a jury should make calculations, if disputed, for purposes of the award. See Lindemann & Grossman, at 640-41.

-21-

that job only a few days after leaving Spencer Press. Johnson was found eating food for which he had not paid, in violation of Hannaford company rules. This failure to mitigate damages, held the district court, eliminated the availability of either back pay or front pay for any time period after December 8.[9] Moreover, the district court found that there was insufficient evidence that the mistreatment Johnson endured at Spencer Press was causally responsible for his being fired from Hannaford. The court concluded that Johnson's own lay testimony to this effect did not create an issue of fact and that Johnson's expert was not "specific enough" on the link between Johnson's disability and his misbehavior at Hannaford.[10]

---

[9]The district court's initial ruling on this issue was that "the value of the Hannaford wages and benefits, whatever it is, can be treated as an ongoing offset to Johnson's loss resulting from leaving [Spencer Press]." This holding would have entitled Johnson to receive the differential between his wages at Hannaford and Spencer Press not only for the period he was employed at Hannaford from May 2 to December 8, 2000 (the $1,227.94), but also for the period after December 8, 2000. After trial, the district court altered its decision, holding that back pay was only available "for the time during which the plaintiff was employed at Hannaford Bros."

[10]The district court, in light of its ruling on the availability of front pay, granted Spencer Press's motion in limine to exclude an expert witness who would present a statistical model predicting Johnson's lost front pay. Because we ultimately conclude that Johnson was not entitled to front or back pay beyond December 8, 2000, we affirm the district court's refusal to consider the expert testimony offered to prove the economic consequences of Johnson's termination from Hannaford.

Johnson's cross-appeal does not dispute the conclusion that Spencer Press was not responsible for his termination from Hannaford. Instead, Johnson's basic argument is that the district court misunderstood the implications of his being fired from Hannaford for the availability of both front and back pay. Johnson argues that his termination from Hannaford only tolled the availability of back pay until he was able to find another job, and that the district court erroneously held that the availability of back pay was permanently cut off at that point. Johnson makes a similar argument as to front pay, claiming that the district court still had discretion to award front pay even after he was fired from Hannaford. Furthermore, Johnson says that he was unable to find a job after he was fired from Hannaford because he was psychologically completely disabled and Spencer Press is responsible for this disability. As a result, Johnson argues, Spencer Press is liable for back pay after he was fired from Hannaford because it was responsible for his inability to end the tolling period. Similarly, Johnson says that the district court could also have awarded front pay on this rationale. The analytical issues as to back pay and front pay are similar.

A. <u>Back pay</u>

Review of the legal principles used by the district court in determining the availability of back pay is de novo. <u>Reich</u> v. <u>Cambridgeport Air Sys.</u>, 26 F.3d 1187, 1190 (1st Cir. 1994).

Johnson's appeal raises a number of difficult issues.  As Johnson notes, the district court's final holding was that once Johnson was fired from Hannaford, he was no longer eligible for any back pay.[11]

The district court was correct that once Johnson was fired from Hannaford for misconduct, he was no longer mitigating his damages, as was required.  But that did not mean that the possibility of back pay was permanently cut off.  Although the district court did not explicitly endorse, or even give reasons for, such a rule, its holding necessarily relied on this supposition of law.[12]  We hold that this was error.

In fact, at least two circuit courts have found that back pay awards can accrue for periods after an employee is terminated

---

[11]If this conclusion was incorrect -- as we think it was -- then a series of issues normally would arise about how to calculate back pay once an employee is fired from interim employment while attempting to mitigate damages stemming from unlawful discrimination.  One such issue is whether back pay should be withheld for the period during which the employee is trying to find another job, or should remain at the level it was at prior to the firing.  Although we note this question below, we leave it unresolved because of an intervening dispositive fact: Johnson was unable to find employment after being fired from Hannaford because he was totally disabled and he did not produce sufficient evidence that Spencer Press caused that disability.

[12]The district court's failure to address Johnson's argument that Spencer Press was responsible for his total disability is attributable to the court's belief that the issue was irrelevant because Johnson's termination from Hannaford was dispositive of the issue.  After all, Johnson filed a motion for reconsideration that specifically claimed that the district court had neglected Spencer Press's responsibility for his ultimate disability, and the district court denied it without comment.  In the end, however, the reason for the district court's error is not relevant to the analysis; all that is pertinent is that the error was made.

from an "employer B" when the job at "employer B" was serving to mitigate damages arising from discriminatory conduct by "employer A."  See Delight Wholesale, 973 F.2d at 670 (back pay period was temporarily tolled after plaintiff voluntarily quit for personal reasons and began to run once she found a new job); Brady, 753 F.2d at 1278-80 (back pay is temporarily tolled after an employee is fired for misconduct in the course of mitigating damages from a previous illegal discharge and begins again once the employee finds another job).  These holdings stem, at least in part, from the NLRB's rule on the issue, first articulated in Knickerbocker Plastic Co., 132 N.L.R.B. 1209, 1215 (1961):

> We further find that, as a result of such quitting, each of these claimants shall be deemed to have earned for the remainder of the period for which each is awarded back pay the hourly wage being earned at the time such quitting occurred. Therefore, an offset computed on the appropriate rate per hour will be deducted as interim earnings from the gross back pay of each of these claimants. This offset shall be made applicable from the date of the unjustified quitting throughout the remainder of the back pay period for each particular claimant.

(emphasis added).  Because Title VII's back pay language was "'expressly modeled' on the analogous remedial provision of the National Labor Relations Act (NLRA)" the "principles developed under the NLRA generally guide, but do not bind, courts in tailoring remedies under Title VII."  Ford Motor Co., 458 U.S. at 226 n.8 (internal citations omitted).

We hold that back pay is not permanently terminated when an employee is fired for misconduct or voluntarily quits interim

-25-

employment.[13]  This view comports with the purpose of the back pay remedy as articulated in Albermarle.  Albermarle taught that back pay is a presumptive entitlement of a victim of discrimination and that the discriminating employer is responsible for all wage losses that result from its unlawful discrimination, at least until the time of judgment.[14]  422 U.S. at 419-21.  Had there been no discrimination at employer A, the employee would never have come to work (or have been fired) from employer B.[15]  The discriminating

---

[13]We do not suggest that a jury is required to extend the period of back pay under the circumstances, but only that there is no rule of law precluding it from doing so.

[14]This issue is different from the issue of cutting off back and front pay when there is after-acquired evidence of wrongdoing that would have resulted in the employee's discharge from employer A.  In such cases, the Supreme Court has held that both front and back pay are indeed cut off at the time that the defendant discovers evidence that would have led it to fire the plaintiff on legitimate grounds.  McKennon v. Nashville Banner Publ'g Co., 513 U.S. 352, 361-62 (1995).  That result follows from the simple guiding principle that the employee should be restored to the position he or she would have been in absent the discrimination: the employee would have been fired regardless of the discrimination as a result of the misconduct at the defendant's place of employment.  See id. at 362.

[15]There is a sub-issue about whether back pay, offset by deemed wages from employer B, should continue while the employee diligently searches for post-employer-B employment.  The view of the Fourth and Fifth Circuits is that back pay should equal zero during "periods of unemployment following justified discharge" because "[d]uring such a period the claimant has excluded himself from the employment market."  Brady, 753 F.2d at 1280; see Patterson v. P.H.P. Healthcare Corp., 90 F.3d 927, 935 (5th Cir. 1996).  Notably, though, this perspective is in opposition to the NLRB's rule in Knickerbocker, which would leave a back pay award unchanged after an employee had been fired from a job at which she was mitigating damages from a prior unlawful termination.  See Knickerbocker, 132 N.L.R.B. at 1215.  It also appears to be at odds

employer (employer A) should not benefit from the windfall of not paying the salary differential when the employee is re-employed by employer C.[16]  Further, the use of per se rules is contrary to the general principle that the necessary balancing of the equities requires a case-by-case approach.  Rosario-Torres v. Hernandez-Colon, 889 F.2d 314, 321 (1st Cir. 1989) (en banc) ("[T]he hallmark of equity is the ability to assess all relevant facts and circumstances and tailor appropriate relief on a case by case basis."); Medlock v. Ortho Biotech, Inc., 164 F.3d 545, 555 (10th Cir.), cert. denied, 528 U.S. 813 (1999).

Ultimately, we need not craft general principles for how back pay should be calculated when an employee who has been discriminated against is fired from intervening employment.  But our holding does require us to reach a second issue.  Here, once Johnson was fired from Hannaford, he never sought out employment

with the rule in the Eighth Circuit.  See NLRB v. Hopcroft Art & Stained Glass Works, Inc., 692 F.2d 63, 65 (8th Cir. 1982) ("[T]he amount the employee would have earned had he not quit is to be offset for the remainder of the back pay period.").  Leaving the back pay award unchanged after the employee is fired from interim employment, the logic goes, would put the employee in the position that he would have been in had he exercised reasonable diligence in never being fired.

[16]Yet another sub-issue that we note involves how to calculate the back pay award while the plaintiff is employed at employer C. This is particularly difficult when the salary at employer B was higher than the salary at employer C.  The Brady court held that the greater of the two salaries should be used for calculating back pay while the employee is at employer C.  See Brady, 753 F.2d at 1278-80.  We do not reach this issue.

before trial in a further attempt to mitigate damages.  Johnson explains that he did not seek further employment because he was unable to work as he suffered from a total psychological disability; indeed, Johnson received a 100 percent non-service connected disability rating from the Veteran's Administration.  Some courts have adopted a rule that if a plaintiff is unable to mitigate damages due to a disability not caused by the discriminatory employer, that disability cuts off back pay liability.[17]  Lathem v. Dep't of Children & Youth Servs., 172 F.3d 786, 794 (11th Cir. 1999) ("[C]ourts exclude periods where a plaintiff is unavailable to work, such as periods of disability, from the back pay award."); Starceski v. Westinghouse Elec. Corp.,

---

[17]Why this should be so is not self-evident.  If the plaintiff would have been entitled to some form of salary continuation or benefits for disability had he remained employed at the discriminatory employer, it is not clear why he would not be entitled to the equivalent if he became disabled from working post-employment and before trial.  Indeed, at least one circuit has held that back pay awards should not be cut off due to a post-termination disability if the plaintiff would have been entitled to some form of salary continuation or disability benefits had he not been unlawfully terminated.  Thornley v. Penton Publ'g, Inc., 104 F.3d 26, 31 (2d Cir. 1997).  This reasoning is simply a logical outgrowth of the principle that back pay should put the plaintiff in the position he or she would have been in but for the unlawful discrimination.  Cf. Gutzwiller v. Fenik, 860 F.2d 1317, 1333 (6th Cir. 1988) (back pay "should include the salary, including any raises, which plaintiff would have received but for the discrimination, as well as sick leave, vacation pay, pension benefits and other fringe benefits she would have received but for discrimination").

Johnson does not raise this issue here because he presents no evidence and makes no claim that he would have been entitled to disability benefits at Spencer Press had he not been unlawfully terminated.

54 F.3d 1089, 1101 (3rd Cir. 1995) ("[A]s a general rule . . . an employer who has discriminated need not reimburse the plaintiffs for salary loss attributable to the plaintiffs and unrelated to the employment discrimination." (internal quotation marks omitted)). Here, Johnson does not argue that a disability arising independently of the discriminatory employer does not cut off back pay, so we do not rule on the issue. Johnson does, however, argue that there was evidence that his disability was caused by the harassment he endured at Spencer Press. If it was, he says, then both back pay and front pay should have been available even after he was fired from Hannaford for misconduct.

Johnson is correct that several courts have held that an employee who is unable to work due to a disability is not precluded from receiving back pay when the employer "caused" the disability. This court has, applying Massachusetts law, endorsed that rule. See Blockel v. J. C. Penney Co., 337 F.3d 17, 27-28 (1st Cir. 2003). We now extend that holding to Title VII; an employee who cannot mitigate damages because of the unlawful actions of the employer can still receive back pay. See Lathem, 172 F.3d at 794 ("[A] Title VII claimant is entitled to an award of back pay where the defendant's discriminatory conduct caused the disability."); Durham Life Ins. Co. v. Evans, 166 F.3d 139, 157 (3d Cir. 1999) ("Because [the employer's] conduct affirmatively impaired [the employee's] ability to mitigate her damages, it would be

-29-

inequitable to reduce her back pay award in this case."). This rule is merely a logical corollary of the principle that the victims of discrimination should be restored, "so far as possible . . . to a position where they would have been were it not for the unlawful discrimination." Albermarle, 422 U.S. at 421. If the employer's unlawful conduct caused the employee's inability to mitigate damages, then the employer should be liable for the resulting consequences.

Nonetheless, the evidence provided by Johnson does not allow him to take advantage of this rule. That evidence does no more than create an issue regarding whether the harassment at Spencer Press was one among numerous other independent and significant contributing factors to Johnson's psychological disability. Besides his own testimony, the only evidence that Johnson offered was the testimony of one expert, Dr. Ananis. Dr. Ananis stated in a deposition that Johnson

> had been able to maintain a certain degree of functioning
> and employment until the events which took place during
> his employment at Spencer Press, including the harassment
> he stated he received while he worked there. I am aware
> that Mr. Johnson had other issues in his life, including
> family deaths, divorce, and problems with his sons, and
> I did not make a determination as to what event or
> events, if any, caused his depression and panic and
> anxiety disorders. Nevertheless, it is clear to me that
> the events at Spencer Press relating to the harassment he
> stated he received from his supervisor exacerbated his
> depression and panic and anxiety disorders.

Although this testimony may have created a genuine question of fact about whether there was some relationship between the harassment at

Spencer Press and Johnson's disability, it was not sufficient for Johnson to escape summary judgment on the issue.  Given that Johnson was able to find a new job at Hannaford immediately after leaving Spencer Press and then to keep the job for the next seven months and given that Johnson has had numerous other significant problems in his life that may have been causally related to his disability, the evidence was insufficient.

Johnson's own testimony does not bridge the gap.  Johnson confirmed that he had suffered from depression and anxiety since 1993, and that he had family problems as well as the problems he suffered at Spencer Press.  But he did not, and could not (owing to his lack of expertise), testify that his inability to get a job after Hannaford was caused by the harassment at Spencer Press.

B.  Front Pay

For the same reasons that we affirm the denial of back pay after December 8, 2000, we conclude that there was no abuse of discretion in the district court's refusal to grant front pay.

**IV.**

The district court's judgment is **<u>affirmed</u>**.


**Concurring opinion follows.**

-31-

**CYR, <u>Senior Circuit Judge</u>, concurring.** Although I agree that the grant of summary judgment must be upheld, I write separately because the discussion in the majority opinion regarding whether the district court improperly predicated its decision on the legal principle that Johnson's termination by Hannaford permanently severed his entitlement to back pay is an academic exercise wholly unnecessary to the disposition of the appeal. Even if it were to be assumed that this principle constituted an implicit rationale upon which the district court relied – which I seriously doubt – its adoption plainly did not constitute outcome-determinative error. Rather, just as the Rule 56 proffer made by Johnson (<u>viz.</u>, the Ananis deposition) was not sufficient to prove that SPM caused the misconduct that led to his termination by Hannaford, so too it logically could not constitute evidence that SPM caused Johnson's full disability. Thus, as Johnson was required to bear the burden of proof on causation, SPM was entitled to summary judgment under either legal theory.