[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] DECISION
Before this Court are post trial motions filed by Defendant, Brown University, and Plaintiff, Fred Shoucair (Shoucair). The jury awarded Shoucair $175,000 in compensatory damages, $100,000 in punitive damages and $400,000 in back pay damages. Brown University timely renewed its motion for judgment as a matter of law pursuant to R.I. Super. Ct. R. Civ. P. 50(b) and moves, in the alternative, for a new trial pursuant to Rule 59. Additionally, Brown University moves this Court to strike the damages award. Shoucair moves for reinstatement or, alternatively, an award of front pay. Shoucair's attorneys also petition this Court for attorneys' fees.
 FACTS AND TRAVEL BACKGROUND
Fred Shoucair, a native of Lebanon, obtained his Bachelor of Science and doctoral degrees in electrical engineering from Columbia University. On July 1, 1987, Shoucair was hired by Brown University (Brown) as an assistant professor in the Electrical Sciences group of the Division of Engineering. His duties as assistant professor included teaching undergraduate and graduate students, advising doctoral students, and conducting research. Shoucair's position was a tenure track position.
After an initial waiting period, the tenure review process at Brown begins with the appointment of a Tenure Review Committee, consisting of two tenured faculty members from the applicant's group and one member from another group. The Tenure Review Committee reviews the applicant's records and solicits evaluations of the applicant's work from experts in his/her field. The Tenure Review Committee makes a recommendation to the applicant's group as to whether tenure should be granted. The tenured faculty within the applicant's group then vote for or against tenure. At trial, the evidence overwhelmingly demonstrated that historically at Brown when the Tenure Review Committee had recommended an applicant for tenure, the tenured faculty of the applicant's group followed that recommendation. After the applicant's group votes on tenure, the decision must be ratified by the applicant's department and then by the Committee on Faculty Reappointment and Tenure.
 HOSTILE ENVIRONMENT CLAIM
In 1998 or 1999, Shoucair was asked to join LEMS (Laboratory for Engineer Man/Machines Systems). The LEMS group met weekly for an hour and was composed of faculty members from the Electrical Sciences group who were involved in speech and signal processing research. The LEMS group included faculty members Harvey Silverman (Silverman), David Cooper (Cooper), William Wolovich (Wolovich), Alan Pearson (Pearson) and Sumit Ghosh (Ghosh). Shoucair testified that Silverman dominated all the weekly discussions and disturbed him by making offensive comments about the faculty, students and women, as well as offensive racial comments. Silverman offended Shoucair personally by asking him about his background and religion and by telling Shoucair that he looked "like a terrorist." Indeed there was universal agreement among witnesses from both camps that Silverman was brash, insensitive, crude and profane. The witnesses, however, did not question his effectiveness as the Dean of Engineering.
 GRADING DISPUTE INCIDENT
In the spring of 1990, Shoucair failed a number of his students in a sophomore-level engineering class. After the semester concluded, Silverman approached Shoucair concerning the grades in that engineering class. Over Shoucair's objection, Silverman and Wolovich, compelled Shoucair to change the grades. Shoucair then complained to the Dean of Engineering, Alan Needleman (Needleman), who ordered that the original grades be restored. Subsequently, Needleman asked Shoucair to meet with two other faculty members and, as a result of the meeting, Shoucair agreed to lower the passing grade for the engineering class. Following this dispute, Shoucair left the LEMS group.
The grading dispute incident and Shoucair's departure from the LEMS group took place at a time when Shoucair's tenure review was approaching. In light of the dispute, three officers from the Faculty Executive Committee, which is comprised of elected leaders of the Brown faculty, spoke with the Dean of Faculty, Brian Shepp, to alert him of the grading dispute. The officers also inquired about the sort of circumstances that would warrant a person to be considered for tenure by an independent group. Shepp testified that based on the grading incident he did not see grounds for an independent body to make Shoucair's tenure decision.
 SHOUCAIR'S TENURE REVIEW AND THESHAM-INTERVIEW
In 1991, Silverman, who was involved in the grading dispute and who was the source of the allegedly offensive comments during LEMS meetings, was named the Dean of the Division of Engineering. In 1992, Silverman asked Maurice Glicksman (Glicksman), Chairman of the Division of Engineering, to chair the Tenure Review Committee for Shoucair's tenure review. Silverman purportedly recused himself from Shoucair's tenure review process because of the grading dispute incident.
In early 1993, the Tenure Review Committee began the process of compiling and reviewing Shoucair's record. Among other materials, Shoucair provided the committee with a list of proposed external reviewers, one of them Yannis Tsividis of Columbia University, an expert in Shoucair's field of micro-electronic devices. Five external reviewers wrote positively about Shoucair. The external reviewers that Glicksman selected to evaluate Shoucair were not familiar with his work and they were therefore unable to comment.
In February of 1993, the Division of Engineering was in the process of filling a faculty vacancy resulting from the resignation of Professor Rosenberg (hereafter the Rosenbergposition). On February 26, 1993, the tenured faculty members voted to offer the Rosenbergposition to a senior scientist from industry named Eli Kapon. During this time period, the Affirmative Action Committee raised questions relative to why the Division of Engineering had declined to interview a number of promising Asian candidates for the Rosenberg-position. The Affirmative Action Committee asked that the Division of Engineering conduct an additional interview. Dean Shepp approved of the request and directed the Division of Engineering to do so. Dean Shepp testified that he was not aware that the interview took place after the vote to extend an offer to Eli Kapon. At trial, Dean Shepp was asked if he could conceive of a situation wherein it would be proper to interview an additional candidate after the division had already made its hiring recommendation and he answered "no." Further, the March 16, 1993 Minutes of the Engineering Executive Committee Meeting appear to reflect that the additional interview of "a candidate from an underrepresented group" was considered to be a mere delay to the process of extending an offer to Eli Kapon.
Shortly after the Affirmative Action Committee requested an additional interview for the Rosenberg-position, Glicksman's secretary, Sandy Spinacci, asked Shoucair to conduct a job interview with an Asian woman. Shoucair testified that he asked Spinacci if the interview was for the Rosenberg-position that the faculty previously voted to offer to Eli Kapon. After consulting with Glicksman, Spinacci confirmed that the proposed interview was for the Rosenberg-position. Shoucair told Spinacci that he refused to interview the woman (hereafter Asian-applicant) and he accused Glicksman of engaging in a sham. Shoucair was ultimately forced to interview the Asian-applicant when Glicksman brought her to Shoucair's office unexpectedly and asked him to spend 15 minutes with her.
Soon thereafter on March 23, 1993, the Tenure Review Committee voted to recommend Shoucair for tenure. Although the recommendation was in favor of tenure, the report indicated that the recommendation was "without enthusiasm." Glicksman testified that he believed Shoucair's teaching was excellent. Nevertheless, he wrote the report without enthusiasm testifying that he believed that the best interests of the faculty would not be served by awarding tenure to Shoucair. Having received the Tenure Review Committee's recommendation in favor of tenure, the tenured faculty within the Electrical Sciences group considered Shoucair for tenure on March 24, 1993. Despite the Tenure Review Committee's recommendation for tenure, the group voted against tenure. During the meeting in which the tenured faculty considered Shoucair's application, Silverman, who had purportedly recused himself from the process, spoke against tenure for Shoucair. Five faculty members — Pearson, Wolovich, Cooper, Daniels, and Lawandy — opposed tenure, and two — Silverman and Glicksman — abstained from the vote. At trial various reasons were proffered for the denial of tenure including concerns with the narrowness of Shoucair's research and perceptions that Shoucair had inadequate grant funding. In sum, Brown has asserted that Shoucair was not adequately qualified for tenure. The Division of Engineering ratified the decision to deny tenure, as did the Committee on Faculty Reappointment and Tenure (ConFRaT). Many witnesses testified that Shoucair's case was the only one they could recall in which the recommendation of the Tenure Review Committee was rejected.
Following the ConFRaT's ratification of the decision to deny tenure, Shoucair filed a grievance with the Faculty Executive Committee against Silverman and Glicksman. In his grievance, Shoucair claimed violation of academic freedom, violation of procedures, and discrimination. The Faculty Executive Committee found that he had a prima facie case and ordered that the matter be heard by the Ad Hoc Hearing Committee. At this hearing, Shoucair and his colleague, Ghosh, both testified to the climate of bigotry created by Silverman. In November 1993, the Ad Hoc Hearing Committee denied Shoucair's grievance and his contract with Brown expired on June 30, 1994.
After leaving Brown, Shoucair sent out about 100 job applications, which resulted in only a few interviews and no offers. In 1995, he worked as a consultant for Bay Computer Associates in Providence while he continued to unofficially advise a graduate student, Sanjay Rebello, until the latter completed his doctoral research. Shoucair then moved to Berkeley, California where he taught an introductory engineering course to non-engineering students at the UC Berkeley from 1996 to 1999. It was a part-time position without benefits, and he eventually left because there was no opportunity to advance. Shoucair testified that he published several papers in 1999 and kept abreast of the literature in his field.
Shoucair instituted the instant action pursuant to Rhode Island's Fair Employment Practices Act (FEPA), alleging (1) discrimination based on his Arab ancestry; (2) hostile work environment based on national origin and ancestry; and (3) retaliation. After a fourteen day trial, a jury found that Shoucair proved the unlawful retaliation claim. The jury found, however, that Shoucair did not prove the hostile work environment claim or the claim that he was denied tenure on the basis of national origin. The jury awarded Shoucair $175,000 in compensatory damages, $100,000 in punitive damages and $400,000 in back pay.
Brown has filed the instant motions for judgment as a matter of law or, alternatively, for a new trial. Brown also moves to strike the damages award. Shoucair has moved for reinstatement or, alternatively, for an award of front pay. Shoucair's current and former attorneys also petition this Court for attorneys' fees.
 STANDARD OF REVIEW MOTION FOR JUDGMENT AS A MATTER OF LAW
Rhode Island Rule of Civil Procedure 50(b) provides in pertinent part as follows:
 "whenever a motion for judgment as a matter of law made at the close of all the evidence is denied . . . the court is deemed to have submitted the action to the jury subject to a later determination of the legal questions raised by the motion."
The motion may thereafter be renewed "by service and filing not later than 10 days after entry of judgment." R.I. Super. Ct. R. Civ. P. 50(b).Id. Rule 50(b) directs that, if a jury returned a verdict, "the court may, in disposing of the renewed motion, allow the judgment to stand or may reopen the judgment and either order a new trial or direct the entry of judgment as a matter of law." Id.
When addressing a renewed motion for judgment as a matter of law, the trial justice must "consider the evidence in the light most favorable to the nonmoving party, without weighing the evidence or evaluating the credibility of the witnesses, and draw from the record all reasonable inferences that support the position of the nonmoving party." Skaling v.Aetna Ins. Co., 742 A.2d 282, 287 (R.I. 1999); see also Rezendes v.Beaudette, 797 A.2d 474, 478 (R.I. 2002). Additionally, "[i]f, after such a review, there remain factual issues upon which reasonable persons might draw different conclusions, the motion for judgment as a matter of law must be denied." Skaling, 742 A.2d at 287; see also Rezendes,797 A.2d at 478. "However, if the only reasonable conclusion that can be drawn from the evidence is that the plaintiff is not entitled to recover, then the motion must be granted." Kenney Mfg. Co. v.Starkweather Shepley, Inc., 643 A.2d 203, 206 (R.I., 1994) (citingHulton v. Phaneuf, 85 R.I. 406, 410, 132 A.2d 85, 88 (1957).
In the instant case, the jury returned a verdict in favor of Shoucair on his retaliation claim. FEPA provides that it is an unlawful employment practice "[f]or any employer . . . to discriminate in any manner against any individual because he or she has opposed any practice forbidden by this chapter. . . ." G.L. 1956 § 28-5-7 (5). In construing FEPA, the Rhode Island Supreme Court has held that the courts should look for guidance to the decisions of federal courts in interpreting Title VII of the Civil Rights Act of 1964. Newport Shipyard, Inc. v. R.I. Comm'n forHuman Rights, 484 A.2d 893, 897-98 (R.I. 1984).
In Title VII employment discrimination cases, "the burden-shifting framework announced in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-804, 93 S. Ct. 1817, 1824-25, 36 L.Ed.2d 668 (1973) . . . allocates burdens of production and orders the presentation of evidence so as `progressively to sharpen the inquiry into the elusive factual question of intentional discrimination.'" Woodman v. Haemonetics Corp., 51 F.3d 1087, 1091 (1st Cir. 1995) (quoting Texas Dept. of Community Affairs v.Burdine, 450 U.S. 248, 255 n. 8, 67 L. Ed. 2d 207, 101 S. Ct. 1089
(1981)). Under this framework, "the employee has the initial burden of establishing a prima facie case demonstrating that the employer has discriminated against him or her for a proscribed reason." Center forBehavior Health, Rhode Island, Inc. v. Barros, 710 A.2d 680, 685 (1998).
In proving a prima facie case for retaliation, "a plaintiff must establish that (1) [he or] she engaged in protected conduct; (2) [he or] she experienced an adverse employment action; and (3) there was a causal connection between the protected conduct and the adverse employment action." Calero-Cerezo v. United States Department of Justice.355 F.3d 6, 25 (1st Cir. 2004) (citing Gu v. Boston Police Department,312 F.3d 6, 14 (1st Cir. 2002)). "One way of showing causation is by establishing that the employer's knowledge of the protected activity was close in time to the employer's adverse action." Wyatt v. City ofBoston, 35 F.3d 13, 16 (1st Cir. 1994) (per curiam); see also Russell v.Enterprise Rent-a-Car Co., 160 F. Supp. 2d 239, 264 (D.R.I. 2001) ("where direct evidence of causation is missing, temporal proximity may provide the necessary nexus to meet the third element of the plaintiff's case").
Once the plaintiff establishes a prima facie case, "a presumption that the employer unlawfully discriminated against the employee arises."Center for Behavioral Health, Rhode Island Inc. v. Barros, 710 A.2d 680, 685 (1998); Rathbun v. Autozone, Inc., 361 F.3d 62, 71 (1st Cir. 2004). Next, the burden of production shifts to the defendant to set forth a legitimate, nondiscriminatory reason for its employment decision.Zapata-Matos v. Reckitt Coleman, Inc., 277 F.3d 40, 45 (2002); Centerfor Behavioral Health, Rhode Island, Inc. v. Barros, 710 A.2d at 685
(citing McDonnell Douglass Corp. v. Green, 411 U.S. 792, 80293 S. Ct. 1817, 1824, 36 L. Ed. 2d 668, 677 (1973)). "As a pragmatic matter, however, `the defendant feels the "burden" not when the plaintiff's prima facie case is proved, but as soon as evidence of it is introduced.'" Bina v. Providence College, 39 F.3d 21, 25 (1st Cir. 1994), cert denied, 514 U.S. 1038, 131 L. Ed. 2d 292, 115 S. Ct. 1406
(1995) (defendant met its burden of articulating a non-discriminatory reason for declining to offer plaintiff a tenure track position even though the proffered nondiscriminatory reasons were voiced only by a minority of the committee members).
If the defendant articulates a non-discriminatory reason for its actions, the presumption of discrimination "disappears and the focus shifts back to the [plaintiff] to demonstrate that the proffered reasons are a mere pretext for discrimination." Center for Behavioral Health,Rhode Island, Inc. v. Barros, 710 A.2d at 685; Rathbun v. Autozone,Inc., 361 F.3d 62, 71 (1st Cir. 2004) ("`[s]o long as the employer proffers such a reason, the inference raised by the plaintiff's prima facie case vanishes'") (quoting Medina-Munoz v. R.J. Reynolds TobaccoCo., 896 F.2d 5, 7 (1st Cir. 1990).
A plaintiff may demonstrate pretext "`by showing that the employer's proffered explanation is unworthy of credence.'" Che v. Massachusetts BayTransportation Authority, 342 F.3d 31, 39 (1st Cir. 2003) (quoting Reevesv. Sanderson Plumbing Prods. Inc., 530 U.S. 133, 143, 147 L. Ed. 2d 105,120 S. Ct. 2097 (2000)). "Although the presumption of discrimination `drops out of the picture' once the defendant meets its burden of production, St. Mary's Honor Center v. Hicks, 509 U.S. 502, 511,125 L. Ed. 2d 407, 113 S. Ct. 2742 (1993)], the trier of fact may still consider the evidence establishing the plaintiff's prima facie case `and inferences properly drawn therefrom . . . on the issue of whether the defendant's explanation is pretextual,' Burdine, [450 U.S. at 255 n. 10,101 S. Ct. at 1095 n. 10, 67 L. Ed. 2d at 216 n. 10 (1981)]." Reeves v.Sanderson Plumbing Prods., Inc., 530 U.S. 133, 143, 120 S. Ct. 2097, 2106, 147 L. Ed. 2d 105, 117 (2000). "Thus, a plaintiff's prima facie case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated." Reeves, 530 U.S. at 148,120 S. Ct. at 2109, 147 L. Ed. 2d at 120.
Brown urges that pursuant to Reeves, Shoucair was required to make a "substantial showing" that the reasons offered by Brown for the denial of tenure were pretextual for retaliation, and Brown moves for judgment as a matter of law on the ground that Shoucair failed to meet that burden. Brown also maintains that Shoucair failed to present any evidence of pretext or falsity of Brown's reasons for denying tenure.
The Court first notes that the Reeves case, did not explicitly establish a "substantial showing" requirement. Rather, in Reeves, the Court merely noted that the plaintiff in that case did in fact make a substantial showing that the employer's explanation for its actions was false. Reeves, 530 U.S. at 144, 147 L. Ed. 2d at 118, 120 S. Ct. at 2107. In the instant case, this Court finds that there was ample evidence in the record to permit the trier of fact to conclude that Brown's reasons for denial of tenure were false and were, therefore, a pretext for retaliation. Specifically, the evidence revealed that Shoucair was asked, by Glicksman's secretary, to interview the Asian-applicant for the Rosenberg-position after the tenured faculty had agreed to offer that position to Eli Kapon. Shoucair asked Glicksman's secretary if the interview was for the Rosenberg-position, and she indicated that she would check with Glicksman. There is further evidence that Glicksman's secretary subsequently told Shoucair that the interview of the Asianapplicant was indeed for the Rosenberg-position. Shoucair testified that he objected to conducting the interview, and Glicksman's secretary testified that she felt that she was in the middle of something about which she knew nothing. There is ample evidence that very soon after Shoucair objected to conducting the additional interview, he was denied tenure. See Wyatt v. City of Boston, 35 F.3d 13, 16 (1st Cir. 1994) (per curiam) (plaintiff may show causation "by establishing that the employer's knowledge of the protected activity was close in time to the employer's adverse action."). Moreover, there was evidence that the Tenure Review Committee, chaired by Glicksman, recommended Shoucair for tenure but did so "without enthusiasm." Further, the evidence revealed that after recommending Shoucair for tenure, Glicksman ultimately abstained from the vote on tenure.
Based on the foregoing, the Court concludes that Shoucair set forth sufficient evidence to establish a prima facie case for retaliation. Specifically, he engaged in protected activity by objecting to the sham-interview, he was subsequently denied tenure, and he established a causal connection between the two events, in part, by showing temporal proximity. The foregoing evidence was extremely compelling. As such, the jury was reasonable in concluding that the interview was a set-up of which Shoucair wanted no part. Moreover, the jury was entitled to consider the prima facie evidence as well "inferences properly drawn therefrom . . . on the issue of whether [Brown's] explanation [was] pretextual." Reeves, 530 U.S. at 143, 120 S. Ct. at 2106,147 L. Ed. 2d at 117.
The evidence in the record is more than sufficient to support a finding that Brown's proffered reason for denial of tenure — namely that Shoucair was not qualified — is false. By its own admission, Brown's recommendation for tenure is evidence that Shoucair was qualified for tenure. Shoucair's recommendation for tenure by the Tenure Review Committee is persuasive evidence that he was qualified for tenure even in spite of the fact that the recommendation was made "without enthusiasm." Shoucair also presented evidence that he was qualified for tenure through testimony of some of his colleagues, Professor Tsividis of Columbia University, a leading authority in the Shoucair's field of research and his own testimony. Furthermore, Shoucair presented evidence of a temporal proximity between his objection to the shaminterview and the denial of his application for tenure. In addition, multiple witnesses testified that this was the first instance they could recall in which the recommendation of the Tenure Review Committee was rejected by the tenured faculty. Thus, this Court finds that there was more than sufficient evidence on which the jury could rely in reaching the conclusion that Brown's reasons for the denial of tenure were false. Because Shoucair produced sufficient evidence on the issue of the falsity of Brown's reason, he need not introduce additional, independent evidence of discrimination. SeeReeves, 530 U.S. at 149, 120 S. Ct. at 2109, 147 L. Ed. 2d at 121.
As the Court finds that reasonable persons could reach different conclusions as to whether Brown's reason for denial of tenure was a pretext for discrimination, this Court cannot declare as a matter of law that the evidence leads to only one conclusion. Drawing all reasonable inferences in favor of Shoucair, without weighing the evidence or assessing the credibility of witnesses, and reviewing the record as a whole, this Court finds that Brown is not entitled to judgment as a matter of law.
 MOTION FOR A NEW TRIAL
In the alternative, Brown seeks a new trial pursuant to Super. Ct. R. Civ. P. 59, which provides that:
 "[a] new trial may be granted to all or any of the parties and on all or part of the issues, (1) in an action in which there has been a trial by jury for error of law occurring at trial or for any of the reasons for which new trials have heretofore been granted in actions at law in the courts of this state."
It is well settled that when reviewing a motion for new trial, the trial justice sits as an extra juror and must "independently weigh, evaluate and assess the credibility of the trial witnesses and evidence." Graffv. Motta, 748 A.2d 249, 255 (R.I. 2000) (quoting Morrocco v. Piccardi,713 A.2d 250, 253 (R.I. 1998) (per curiam)). Upon determining that the evidence is "evenly balanced or is such that reasonable minds, in considering the same evidence, could come to different conclusions, the trial justice must allow the verdict to stand," Graff, 748 A.2d at 255, even if the trial justice entertains some doubt as to the verdict's correctness. Marcotte v. Harrison, 443 A.2d 1225, 1232 (R.I. 1982). Thus, "the jury's verdict will remain unchanged if [the reviewing court], upon looking at the record in the light most favorable to the prevailing party, finds any competent evidence which sustains the jury's verdict." Fox v. Allstate Ins. Co., 425 A.2d 903, 907 (R.I. 1981) (quoting Powers v. Carvalho, 117 R.I. 519, 525, 368 A.2d 1242, 1246 (1977)). Only where the verdict "fails to respond truly to the merits of the controversy and to administer substantial justice and is against the preponderance of the evidence," should the court set aside the jury's verdict and order a new trial. Galusha v. Carlson, 120 R.I. 204, 206-206, 386 A.2d 634, 635 (R.I. 1978). Though the trial justice "need not perform an exhaustive analysis of the evidence, he or she must refer with some specificity to the facts which prompted him or her to make the decision so that the reviewing court can determine whether error was committed." Reccko, 610 A.2d at 545 (citing Zarrella v. Robinson,460 A.2d 415, 418 (R.I. 1983)).
Brown asserts that the jury misconceived the evidence with regard to the retaliation claim. Brown contends that the evidence confirmed only that there was close temporal proximity between Shoucair's objection to conduct the interview of the Asian-applicant and the issuance of the Tenure Review Committee's report. Brown urges that there was no other evidence to support the retaliation claim. Brown notes, inter alia, that both Spinacci and Glicksman testified that they were unaware of Shoucair's concerns over the additional interview for the Rosenberg-position. Brown thus reasons that the jury failed to consider Glicksman and Spinacci's testimony. Brown also argues that Shoucair failed to produce evidence that other members of the Tenure Review Committee were aware of Shoucair's objection to conduct the interview. Brown further maintains that there was no evidence on which the jury could properly infer retaliatory bias or the falsity of the proffered reasons for denying tenure and, consequently, the jury erroneously found that Brown's stated reason for the denial of tenure was pretext for retaliation.
In the instant case, there was evidence that shortly after Shoucair complained to Glicksman's secretary that the additional interview of the Asian-candidate was a sham, Glicksman recommended tenure "without enthusiasm." Immediately thereafter, Shoucair was denied tenure on the ground that he was not qualified. The Court found Shoucair's testimony regarding his conversations with Glicksman's secretary to be extremely credible and persuasive. While Glicksman's secretary, Spinacci, was clearly a good soldier who was in an extremely awkward position, her testimony and that of Glicksman was not compelling or persuasive in the least. The Court was not at all persuaded by evidence suggesting that Glicksman and his secretary were unaware of Shoucair's concerns. Further, there was evidence that this was the first time anyone could remember a tenure recommendation being rejected. Additionally, Shoucair presented evidence that he was qualified for tenure by introducing recommendations from experts in his field and the evidence that he was, in fact, recommended for tenure.
This Court finds that there was evidence upon which the jury could reasonably rely in concluding that Shoucair was denied tenure in retaliation for his refusal to conduct the sham-interview for the Rosenberg-position. It can be inferred from the testimony of Shoucair, Spinancci and Glicksman that Glicksman was indeed aware of Shoucair's feelings concerning the interview. Far from failing to consider the testimony of Spinacci and Glicksman, the jury apparently found the same to be lacking in credibility. Moreover, evidence was presented indicating that Shoucair was qualified for tenure including the fact that he was recommended for tenure, albeit "without enthusiasm." Thus, the jury reasonably concluded that Brown's proffered reason for denial of tenure — that Shoucair was not qualified — was false. Based on the record evidence outlined herein, this Court finds that the jury could infer retaliatory bias and falsity of the proffered reasons for denial of tenure.
After weighing the evidence and examining the credibility of witnesses, this Court finds that reasonable minds could have differed upon consideration of the evidence and testimony at trial, and the jury's verdict was a valid response to the merits of the case. This Court is satisfied that the jury's verdict is supported by the fair preponderance of the evidence and the reasonable inferences drawn there from. As such, this Court must allow the verdict of the jury to stand
 MOTION TO STRIKE DAMAGES
The jury awarded Shoucair $175,000 in compensatory damages, $100,000 in punitive damages, and $400,000 in back pay. Brown moves this Court to strike these damage awards.
Punitive Damages
"There is no vested right to punitive damages on the part of the plaintiff and where allowed, they are awarded as a matter of public policy to punish outrageous conduct by the defendant or to deter similar behavior in the future." McKinnon v. Kwong Wah Restaurant, 83 F.3d 498, 508 (1st Cir. 1996). The trial court has wide discretion to affirm a jury's award of punitive damages. McMillan v. Mass. Soc. for Preventionof Cruelty to Animals, 140 F.3d 288, 306 (1st Cir. 1998), cert. denied,525 U.S. 1104, 142 L. Ed. 2d 772, 119 S. Ct. 870 (1999). The Rhode Island Supreme Court has instructed that "although the fixing of damages is generally a jury function, it may be interfered with by a trial justice on a motion for a new trial if, in the exercise of his or her independent judgment in passing upon the evidence of damages, the trial justice finds that the award is grossly in excess of an amount adequate to compensate the plaintiff for the wrong done." Zarrella v. Robinson, 460 A.2d 415, 418 (R.I. 1983). In a discrimination case, the Court may set aside a punitive damages award if such award "constitutes a grossly excessive award of damages that shocks the conscience." See McMillan,140 F.3d at 307.
FEPA provides for the award of punitive damages "where the challenged conduct is shown to be motivated by malice or ill will or when the action involves reckless or callous indifference to the statutorily protected rights of others. . . ." R.I. Gen. Laws § 28-5-29.1 (1956). Similarly, "under Title VII, a plaintiff must demonstrate that the defendant acted with malice or reckless indifference before he or she can receive punitive damages." McKinnon, 83 F.3d at 507.
Brown argues that Shoucair failed to present evidence establishing that Brown's tenure denial was motivated by malice, ill will or that the decision involved reckless or callous indifference to Shoucair's statutorily protected rights. Brown contends that even if the jury believed Glicksman intended to punish Shoucair for his objection to conducting the interview, the evidence is not sufficient to support an award of punitive damages.
Punitive damages are authorized in cases that involve intentional discrimination. Kolstad v. American Dental Ass'n, 527 U.S. 526, 534,119 S. Ct. 2118, 2124, 144 L. Ed. 2d 494, 505 (1999). In order to fall within the ambit of an intentional discrimination case, "`the employer must act with malice or reckless indifference to the plaintiff's federally protected rights.'" Che v. Massachusetts Bay Transp. Auth.,342 F.3d 31, 41 (1st Cir. 2003) (quoting Kolstad, 527 U.S. at 535, 119 S. Ct. at 2124,144 L. Ed. 2d at 505). It is "unnecessary to show actual malice to qualify for a punitive award," however; a showing of recklessness is required. Kolstad, 527 U.S. at 536, 119 S. Ct. at 2125,144 L. Ed. 2d 506. The United States Supreme Court has explained that "the terms `malice' or `reckless indifference' pertain to the employer's knowledge that it may be acting in violation of federal law, not its awareness that it is engaging in discrimination." Kolstad,527 U.S. at 535, 119 S. Ct. at 2124,144 L. Ed. 2d at 505. This means that "an employer must at least discriminate in the face of a perceived risk that its actions will violate [state] law to be liable in punitive damages." Kolstad, 527 U.S. at 536, 119 S. Ct. at 2125,144 L.Ed. 2d 506. In Kolstad the Court further held that the employer need not engage in "conduct with some independent, `egregious' quality before being subject to a punitive award." Kolstad, 527 U.S. at 538, 119 S. Ct. at 2126,144 L. Ed. 2d at 507.
The instant case involves intentional discriminatory retaliation. The jury found that Shoucair was denied tenure because he engaged in conduct protected by anti-discrimination laws. The jury's conclusion that Glicksman intended to punish Shoucair in retaliation for his objection to interviewing the Asian-applicant was supported by the evidence and is sufficient to support an award of punitive damages. See Che,342 F.3d at 41 ("when an employer retaliates against an employee because the employee engages in conduct that is protected by wellestablished federal statutes, a jury, could, but need not, fairly infer that the employer harbored malice or reckless indifference towards those civil rights"). Shoucair testified that Glicksman told him that his reference letters were positive and that there was no way Brown could deny him tenure. After the sham-interview incident, however, Glicksman recommended tenure "without enthusiasm," thereby setting in motion Shoucair's tenure denial. One could infer that Glicksman knew that the effect of placing those words on Shoucair's report would result in a denial of tenure. The Court is satisfied that, based upon evidence introduced at trial, a reasonable jury could have found that Glicksman acted with malice or with reckless indifference to Shoucair's protected rights and that there was an evidentiary basis from which the jury could award punitive damages as a form of punishment or to deter future discriminatory conduct. Further, the award will not be set aside or reduced because it is not excessive and does not shock the conscience of the Court.
Compensatory Damages
FEPA also provides for an award of compensatory damages. R.I. Gen. Laws § 28-5-24 (b) and provides that "the [plaintiff] is not required to prove that he or she has suffered physical harm or physical manifestation of injury in order to be awarded compensatory damages." Id. Additionally, "the damages provisions of 42 U.S.C. § 1981a, part of the Civil Rights Act of 1991, provide for the availability of compensatory damages to victims of intentional discrimination in violation of Title VII."McKinnon v. Kwong Wah Restaurant, 83 F.3d 498, 506 (1st Cir. 1996). The Court will not "override" a compensatory "damage determination unless the award is unsupported by the evidence, grossly excessive, or shocking to the conscience." Id.
Brown argues that the award for compensatory damages must be stricken because it is unsupported by the evidence. Brown contends that the only medical record presented regarding Shoucair's pain and suffering indicates that his physical problems are not attributable to emotional distress. Title VII defines compensatory damages as "future pecuniary losses, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other non-pecuniary losses." 42 U.S.C. § 1981a
(b)(3). An award of compensatory damages does not require a showing of any physical injuries or manifestations. Section 28-5-24; see also Turicv. Holland Hospitality, 85 F.3d 1211, 1215 (6th Cir. 1996) ("It is well settled that Title VII plaintiffs can prove emotional injury by testimony without medical support"). Shoucair's testimony that he suffers from emotional problems and anxiety is sufficient to support an award for compensatory damages. See Merriweather v. Family Dollar Stores ofIndiana, Inc., 103 F.3d 576, 580 (7th Cir. 1996) (noting that a plaintiff's testimony may suffice to support an award for non-pecuniary losses). As this Court finds that the award is not excessive, and does not shock the conscience, it will not be set aside.
Back Pay
Brown also moves to strike the award of back pay. FEPA provides for an award of back pay to make the aggrieved party whole if the court determines that that the defendant engaged in unlawful employment practices. R.I. Gen. Laws § 28-5-24 (a). "Back pay shall include the economic value of all benefits and raises to which an employee would have been entitled had an unfair employment practice not been committed, plus interest on those amounts." Id.
As with FEPA, "the remedial scheme in Title VII is designed to make a plaintiff who has been the victim of discrimination whole through the use of equitable remedies" including, but not limited to, back pay. Selgasv. American Airlines, 104 F.3d 9, 12 (1st Cir. 1997). "Trial courts have discretion to fashion the awards in Title VII cases so as to fully compensate a plaintiff in a manner that suits the specific facts of the case; this discretion includes the selection of the elements which comprise the remedial recovery." Selgas, 104 F.3d at 13. Under Title VII an award of back pay should be denied "only for reasons which, if applied generally, would not frustrate the central statutory purposes of eradicating discrimination throughout the economy and making persons whole for injuries suffered through past discrimination." Albemarle PaperCo. v. Moody, 422 U.S. 405, 421, 95 S. Ct. 2362, 2373, 45 L. Ed. 2d 280, 299 (1975). Thus, the Albermarle case teaches "that back pay is a presumptive entitlement of a victim of discrimination and that the discriminating employer is responsible for all wage losses that result from its unlawful discrimination, at least until the time of judgment."Johnson v. Spencer Press of Me., Inc., 364 F.3d 368, 382 (1st Cir. 2004). A plaintiff is, therefore, entitled to "recover for what he would have earned absent the discharge, reduced by any compensation he actually received and any amount that he would have received through reasonable efforts to mitigate the damages, with the employer bearing the burden of proof on the issue of mitigation." Carey v. Mt. Desert Island Hosp.,156 F.3d 31, 40-41 (1st Cir. 1998); see also Hutchison v. Amateur Elec.Supply, 42 F.3d 1037, 1044 (7th Cir. 1994) (to establish failure to mitigate the defendant must show, "(1) the plaintiff failed to exercise reasonable diligence to mitigate her damages, and (2) there was a reasonable likelihood that the plaintiff might have found comparable work by exercising reasonable diligence").
With respect to mitigation, the plaintiff need only make reasonable efforts to mitigate damages; the burden is not "onerous and does not require him to be successful in mitigation." Rasimas v. Michigan Dept. ofMental Health, 714 F.2d 614, 624 (6th Cir. 1983). There is no comparable mitigation provision in FEPA. However, the Rhode Island Supreme Court has imposed a duty to mitigate in an employment discharge case which involved § 36-4-1 et. seq., the Merit System Act for Public Officers and Employees, holding that
 "in situations in which an employee seeks to recover compensation for damages sustained during a period of unlawful discharge, the burden of proof on the mitigation of damages is on the employer, and this burden can be satisfied by proof that (1) one or more discoverable opportunities for comparable employment were available in a location as convenient as, or more convenient than, the former place of employment, (2) the employee made no attempt to apply for any such job, and (3) it was reasonably likely that the employee would obtain one of those comparable jobs."
Morinville v. Moran, 477 A.2d 74, 76 (R.I. 1984).
"Although the [plaintiff] need not go into another line of work, accept a demotion, or take a demeaning position, he forfeits his right to back pay if he refuses a job substantially equivalent to the one he was denied." Ford Motor Co. v. Equal Employment Opportunity Comm'n,458 U.S. 219, 231-32, 102 S. Ct. 3057, 3065-66, 73 L. Ed. 2d 721, 732-33 (1982). If the defendant establishes that the plaintiff failed to diligently seek new employment, an award of back pay may be reduced.Carey v. Mt. Desert Island Hosp., 156 F.3d 31, 40-41 (1st Cir. 1998) (affirming the trial court's reduction of the back pay award based on defendant's showing that the plaintiff did not exercise reasonable diligence in searching for comparable employment); Conetta v. Nat'l HairCare Ctrs., Inc., 236 F.3d 67, 77 (1st Cir. 2001) (since "no one knows exactly what would have happened if [plaintiff] had been more vigorous in her efforts [to obtain comparable employment] . . . the district court's use of a partial discount [of 25%] was a sensible way of resolving the problem").
Brown argues that the jury failed to take into consideration evidence of Shoucair's failure to mitigate his damages. Brown introduced expert testimony from David Temple demonstrating that after Shoucair's departure from Brown, there was great demand for electrical engineers in industry. In addition, evidence was presented indicating that Shoucair declined to seek academic positions at Columbia or Yale where positions were available and with which institutions Shoucair arguably had been affiliated. Brown also asserts that in finding substantially equivalent employment, Shoucair was not limited in seeking and accepting positions as a professor but was required to seek positions in which he could utilize his skills, background and experience. Brown, therefore, argues that there were substantial positions in the high tech industry available at the time Shoucair left Brown, which were consonant with Shoucair's skills, background, and experience and would not have been more arduous than his previous position.
Shoucair argues that Brown's evidence focuses on the availability of jobs in the business sector, which Shoucair claims is not substantially equivalent to a university professor. Shoucair asserts that, although the pay may be higher in the corporate world, engineers are not viewed with as high regard as are professors, nor is the job security similar in the high tech industry. Shoucair also testified that he sent out "hundreds of resumes" and had several interviews in an attempt to secure a similar position at another school. Shoucair contends that his reputation was harmed as a result of the denial of tenure, making it more difficult for him to secure a similar position.
With respect to mitigation of damages, Shoucair was not required to search for a job outside academia. Jobs in the business sector and teaching positions are not "virtually identical." A tenured professor holds more job security than does an engineer, who is prone to layoff. Although the compensation is less in academia than in the private sector, a professor is viewed as having a higher status than an engineer. In the context of mitigation, comparability of status has been deemed more important than comparability of salary in some situations.Rasimas, 714 F.2d at 624. (citing Rutherford v. American Bank ofCommerce, 12 Fair Empl. Prac. Cas. (BNA) 1184, 1190 (D.N.M. 1976), aff'd, 565 F.2d 1162 (10th Cir. 1977)). Accordingly, Shoucair initially was not obligated to seek a position in the business sector.
However, after sending out hundreds of resumes and receiving no job offers, Shoucair's job search drastically diminished. In fact, the evidence reflects that after moving to Berkeley his job search efforts went from systematic to sporadic. The plaintiff's duty to mitigate, nonetheless, does not "evaporate in the face of [such] difficulties."Payne v. Security Sav. Loan Assoc., F.A., 924 F.2d 109, 111 (7th Cir. 1991) (finding plaintiff failed to mitigate damages after a year of unemployment because, although it was earnest and extensive during first year, it slowed down to a trickle thereafter). Therefore, after discovering the unavailability of employment in academia, Shoucair was obligated to search for a position outside academia.
Brown's expert witness testified that at the time Shoucair departed Brown, there were many jobs available in the business sector in both Boston and California which would have enabled him to utilize his skills. Based on expert testimony proffered by Brown as well as Shoucair's testimony concerning his job search efforts, the Court finds that Shoucair failed to exercise reasonable diligence to mitigate his damages. Accordingly, a 30% reduction of his back pay award is warranted. See Conetta v. Nat'l Hair Care Ctrs., Inc., 236 F.3d 67, 77 (1st Cir. 2001) (where plaintiff pursued one application and reviewed the want-ads daily, the First Circuit Court of Appeals affirmed the district court's partial reduction by 25% of the back pay award based on plaintiff's less than vigorous efforts). Shoucair's award of back pay, therefore, will be reduced to $280,000, plus interest as set forth in §28-5-24.
 MOTION FOR REINSTATEMENT OR FRONT PAY Reinstatement
Pursuant to FEPA, "[i]t is an unlawful employment practice . . . (5) [f]or any employer or employment agency . . . to discriminate in any manner against any individual because he or she has opposed any practice forbidden by this chapter. . . ." Section 28-5-7(5). Under FEPA, the remedies available to a victim of unlawful employment practices include, but are not limited to, "hiring, reinstatement or upgrading with or without back pay." § 28-5-24 (a).
In the instant case, the jury found for Shoucair on his retaliation claim, and he is now seeking reinstatement at Brown as an Associate Professor with tenure. The First Circuit Court of Appeals has "recognized that reinstatement is an important remedy because it `most efficiently' advances the goals of Title VII by making plaintiffs whole while also deterring future discriminatory conduct by employers." Chungchi Che v.Mass. Bay Transp. Auth., 342 F.3d 31, 43 (1st Cir. 2003) (quoting Quintv. A.E. Staley Mfg. Co., 172 F.3d 1, 19 (1st Cir. 1999)). Of the remedies available to a victim of unlawful employment practices, the Court has indicated that "the overarching preference is for reinstatement. . . ."Selgas v. American Airlines, 104 F.3d 9, 13 (1st Cir. 1997). Nevertheless, "[c]ourts have quite rarely awarded tenure as a remedy for unlawful discrimination. . . ." Brown v. Boston Univ., 891 F.2d 337, 360 (1st Cir. 1989).
One "consideration that could form the basis for a denial of reinstatement" is the "ineligibility of the employee for the position, due to failure to meet established qualifications, which would permit immediate discharge for no reason or for any permissible reason." Che,342 F.3d at 43, n. 1 (quoting Velazquez v. Figueroa-Gomez, 996 F.2d 425, 429 (1st Cir. 1993)). Reinstatement "is not appropriate unless the person discriminated against is presently qualified to assume the position sought." Kamberos v. GTE Automatic Electric, Inc., 603 F.2d 598, 603 (7th Cir. 1979), cert. denied, 454 U.S. 1060, 70 L. Ed 2d 599, 102 S. Ct. 612
(1981). In Kamberos, the court found that a hiring order was not an appropriate remedy because plaintiff, who sought to be hired as a corporate attorney at GTE, had not had any "significant corporate law" experience during the nineteen years leading up to the Court's decision.Kamberos, 603 F.2d at 603. The Court's holding was based, in part, on the fact that the "field of corporate law is not static and [had] changed significantly. . . ." Id.
Shoucair argues that he should be reinstated with tenure because the tenure denial has tainted any possibility of his finding another teaching position. Brown argues that Shoucair should not be reinstated because he is no longer qualified to be on the Brown faculty, and there are no positions available. Professors from Shoucair's former department testified that the Division of Engineering has changed its priorities in terms of the research done by its professors. As a result, the research performed by Shoucair while he was at Brown and the areas in which he wishes to conduct research now have very little overlap with the research currently being conducted in the department. Further, Shoucair has been virtually inactive during the ten years that have elapsed since he left Brown, apart from a brief stint teaching an introductory electrical engineering course to non-engineering majors at U.C. Berkeley on four occasions. In the last eight years, he has published only three peer-reviewed papers. Brown's faculty members, however, each publish about two papers per year.
In light of the evidence, it is clear that Shoucair is not presently competitively qualified to teach at Brown. A professor's research and teaching abilities are of critical importance to the quality of education Brown University provides to its students. Shoucair has done very little to keep himself current and competitive for the environment at Brown. Specifically, his productivity has been low in terms of publications, and his line of research is also no longer aligned with that of other members of the department. Further, since leaving Brown, Shoucair has not hadany experience teaching engineering students. Analogous to the facts inKamberos, wherein the court found the plaintiff to be unqualified as a corporate lawyer because of her failure to keep current in a field that is ever-changing, the Court finds that Shoucair is not now qualified for a position at Brown because he has not had any significant experience in the constantly evolving field of engineering for almost ten years. Accordingly, Shoucair's motion for reinstatement must be denied.
Front Pay
In the event of the Court's denial of reinstatement, Shoucair alternatively moves for an award of front pay. Front pay is an equitable remedy available under Title VII. Lussier v. Runyon, 50 F.3d 1103, 1107-1108 (1st Cir. 1995). "Awards of front pay . . . are generally entrusted to the [trial judge's] discretion and are available in a more limited set of circumstances than back pay." Johnson v. Spencer Press ofMe., Inc., 364 F.3d 368, 380 (1st Cir. 2004). When reinstatement is not practicable as a remedy, "front pay is available as an alternative to compensate the plaintiff for the period from the conclusion of trial through the point at which the plaintiff can . . . obtain comparable employment elsewhere." Selgas v. American Airlines, 104 F.3d 9, 12 (1st Cir. 1997). The First Circuit Court of Appeals has warned, however, that
 viewing a front pay award in isolation for the purpose of measuring its contribution toward the goals of an antidiscrimination statute is risky business. A front pay award — like any other single strand in a tapestry of relief — must be assessed as a part of the entire remedial fabric that the trial court has fashioned in a particular case.
Lussier, 50 F.3d at 1112. In Carey v. Mt. Desert Island Hosp., the First Circuit Court of Appeals held that the district court acted within its discretion in denying front pay entirely because other relief awarded, including compensatory damages and back pay amounting to $310, 070, "more than adequately compensated the plaintiff." Carey v. Mt. Desert IslandHosp., 156 F.3d 31, 40-41 (1st Cir. 1998); see also Wildman v. LernerStores Corporation, 771 F.2d 605, 616 (1985) (affirming the denial of front pay in an ADEA case where plaintiff's total judgment for compensatory and liquidated damages amounted to $348, 518); Barbano v.Madison County, 922 F.2d 139, 146 (2d Cir. 1990) (holding that the denial of front pay based on the district court's implied finding that the other relief awarded to plaintiff was sufficient, did not constitute an abuse of discretion). Additionally, "when a party fails to provide the district court with the essential data necessary to calculate a reasonably certain front pay award, the court may deny the front pay request." McKnight v.General Motors Corp., 973 F.2d 1366, 1372 (7th Cir. 1992).
In the instant case, Shoucair argues that he is entitled to a front pay award because his ability to find alternate employment in academia has been permanently destroyed by Brown's unlawful actions. Brown argues that Shoucair has failed to provide this Court with any information to assist in calculating a reasonably certain front pay award. Brown also reiterates that Shoucair failed to mitigate his damages. Brown further argues that the denial of tenure did not destroy Shoucair's ability to find alternate employment in academia as Professor Sumit Ghosh obtained a tenured position at another university despite having been denied tenure by Brown. Brown's expert witness also testified that Shoucair would have earned more in private industry than he would have earned if had he remained at Brown; therefore, Brown claims an award of front pay is inappropriate.
In the course of fashioning remedial relief for Shoucair, the Court has carefully considered his request for front pay in light of the record evidence and the other substantial forms of relief he has been awarded. Having found that Shoucair did not exercise the requisite degree of diligence in mitigating his damages, the Court further finds that Shoucair has fallen short of providing the Court with the data necessary to calculate a reasonably certain front pay award. McKnight,973 F.2d at 1372 (court declined to award front pay because the plaintiff provided no basis for calculating an appropriate award). In light of the aforementioned factors and because the Court specifically finds that Shoucair is more than amply compensated for the harm done by the compensatory and punitive damage award, the back pay award and the interest and attorney's fees to which he will be entitled, the Court denies Shoucair's request for front pay.
 MOTION FOR ATTORNEY'S FEES
Shoucair's attorneys also petition this Court for attorney's fees. FEPA provides that "[i]n appropriate circumstances attorney's fees, including expert fees and other litigation expenses, may be granted to the attorney for the plaintiff if he or she prevails." § 28-5-24 (3). The First Circuit Court of Appeals has noted that "the trial court's discretion in respect to fee awards is extremely broad." Lipsett v. Blanco,975 F.2d 934, (1st Cir. 1992). "The lodestar method is the strongly preferred method by which [trial] courts should determine what fees to award prevailing parties. . . ." Coutin v. Young Rubicam P.R.,124 F.3d 331, 337 (1st Cir. 1997) (analyzing a fee award in a § 1988 case); see also Hensley v. Eckerhart, 461 U.S. 424, 433, 103 S. Ct. 1933, 1939, 76 L. Ed. 2d 40, 50, n. 7 (1983) (noting that the standards for awarding fees under Title VII and 42 U.S.C. § 1988 are identical).
Under the lodestar approach, "the most useful starting point for determining the amount of a reasonable fee is the number of hours reasonably expended on the litigation multiplied by a reasonable hourly rate." Hensley v. Eckerhart, 461 U.S. 424, 433, 103 S. Ct. 1933, 1939,76 L. Ed. 2d 40, 50 (1983). The Court in its discretion may then "adjust the fee upward or downward" based on a number of factors including, but not limited to, the "important factor of the results obtained." Hensley,461 U.S. at 434, 103 S. Ct. at 1940, 76 L. Ed. 2d at 51. It is "particularly crucial" for a court to consider the results obtained where "a plaintiff is deemed `prevailing' even though he succeeded on only some of his claims for relief." Id.
In such a case, the United States Supreme Court has explained that "where a plaintiff has obtained excellent results, his attorney should recover a fully compensatory fee." Hensley, 461 U.S. at 435,103 S. Ct. at 1940, 76 L. Ed. 2d at 52. "[T]he fee award may include fees for work performed on unsuccessful claims if that party's unsuccessful claims are interrelated to the successful claims by a common core of facts or related legal theories." Ward v. Hickey, 996 F.2d 448, 455 (1st Cir. 1993).
In contrast, if a plaintiff achieves "only partial or limited success, the product of hours reasonably expended on the litigation as a whole times a reasonable hourly rate may be an excessive amount." Hensley,461 U.S. at 436, 103 S. Ct. at 1941, 76 L. Ed. 2d at 52. Thus, the court may "attempt to identify specific hours that should be eliminated, or it may simply reduce the award to account for the limited success." Id. at 436-37, 1941, 52.
In setting fee awards, courts may also consider the other factors set forth in Johnson v. Georgia Highway Express, Inc., 488 F.2d 714, 717-19 (5th Cir. 1974). Coutin, 124 F.3d at 337, n. 3. Those factors are
 "(1) the time and labor required; (2) the novelty and difficulty of the questions; (3) the skill requisite to perform the legal services properly; (4) the preclusion of other employment by the attorney(s) due to acceptance of the case; (5) the customary fee; (6) the nature of the fee (fixed or contingent); (7) time limitations imposed by the client or the circumstances; (8) the amount involved and the results obtained; (9) the experience, reputation, and ability of the attorneys; (10) the `undesirability' of the case; (11) the nature and length of the professional relationship with the client; and (12) awards in similar cases."
Id. (quoting Johnson v. Georgia Highway Express, Inc.,488 F.2d at 717-719.)
Shoucair's attorneys argue that even though he prevailed on only one claim, the fees should be increased because of the excellent results obtained. Shoucair contends that only the punitive damages award could possibly have been greater had he prevailed on all three claims. Additionally, Dan Siegel, Shoucair's lead counsel, requests that the Court increase his fee by taking into account the contingency fee factor.
In the instant case, Shoucair asserted claims of hostile work environment, national origin bias, and retaliation. As he prevailed on the claim of retaliation, he is a prevailing party and is entitled to attorney's fees. § 28-5-24 (3). While the jury found for Shoucair on only the retaliation claim, it awarded him a substantial judgment totaling $675,000 which included compensatory damages, punitive damages, and back pay. Accordingly, this Court finds that Shoucair obtained excellent results.
With respect to the three claims advanced, the Court specifically finds that they were inextricably related. Specifically, the facts relative to the claims of discrimination and hostile work environment were relevant to establish the history between the parties and would have been essential even if Shoucair had advanced only the retaliation claim. Additionally, both the discrimination and retaliation charges required Shoucair to establish that he was qualified for tenure at Brown and was denied tenure for impermissible reasons. Accordingly, this Court finds that the claims on which Shoucair succeeded were related to the claims on which he did not prevail. Having found that Shoucair's claims were interrelated, the Court further finds that Shoucair achieved a level of success which makes the hours reasonably expended on the litigation as a whole a satisfactory basis for determining a fee award. The Court does not consider Shoucair to be a plaintiff who achieved limited success and will not, therefore, reduce his fee award on that basis. See Hensley,461 U.S. at 436, 103 S. Ct. at 1941, 76 L. Ed. 2d at 52. However, the Court has considered Shoucair's arguments in support of an increase in the fee award and finds that the circumstances here do not warrant such upward adjustment. Hensley, 461 U.S. at 435, 103 S. Ct. at 1940,76 L. Ed. 2d at 52 ("in some cases of exceptional success an enhanced award may be justified").
Siegel's Request for Fees
Attorney Dan Siegel of California is Shoucair's lead counsel, admitted pro hac vice. Siegel became involved in the present case in December 2002 at the request of his spouse and associate, Anne Butterfield Weills, and agreed to work under a partial contingency fee agreement. Weills, who had been advising Shoucair on this matter since 1996, had contacted several Boston and Providence attorneys who declined to take the case for several reasons: the age of the case, the power and wealth of Brown, the fact that he had already worked with two local attorneys, and the fact that the Shoucair lived in California.
Siegel's Reasonable Rate
In determining appropriate attorney's fees for Dan Siegel, this Court must first set a reasonable hourly rate. Siegel requests a total of 492.2 hours at a rate of $425 per hour. Siegel's experience as an attorney has included over 125 jury trials and a similar amount of court trials and arbitration hearings. He regularly represents college and university faculty members, students, and administrative employees involved in litigation with their institutions. Siegel's affidavit sets forth uncontested hourly rates awarded to him in previous employment and labor related trials, which range from $325 to $375 per hour. Siegel argues that $425 per hour is a reasonable rate based upon his experience as an attorney, the excellent results obtained, and fees paid to attorneys of similar experience engaged in similar litigation.
Brown argues that $425 per hour is unreasonable because the federal district court has found that an appropriate range for attorney's fees in Rhode Island is between $125 and $200 per hour, and Siegel is asking for twice as much. Brown points out that its lead counsel is paid only $180 per hour. Brown suggests that Siegel's hourly rate should not be greater than $200 an hour.
"Typically, `reasonable hourly rates should be set by reference to rates in the court's vicinage rather than in the lawyer's region of origin." Rhode Island Med. Soc'y v. Whitehouse, 323 F. Supp. 2d 283
(D.R.I., 2004) (quoting Gay Officers Action League v. Puerto Rico,247 F.3d 288, 296 (1st Cir. 2001); Lipsett v. Blanco, 975 F.2d 934, (1st Cir. 1992) (court determines hourly rates . . . "taking into account the `prevailing rates in the community for comparably qualified attorneys'") (quoting United States v. Metropolitan Dist. Comm'n, 847 F.2d 12, 19 (1st. Cir. 1988).
Siegel has submitted affidavits of three Rhode Island attorneys who state reasonable rates for Siegel's work, which range from $250 to $350 per hour, but Siegel requests to be compensated at a much higher rate of $425 per hour. Brown has submitted affidavits of Rhode Island attorneys showing that the normal and customary rate for this type of litigation is in the range of $175 to $225 per hour.
The trial court, however, is not obligated to adopt the petitioning attorney's customary billing rate or the rate that the attorney asserts is the prevailing rate in the community. Andrade v. Jamestown HousingAuthority, 82 F.3d 1179, 1190 (1st Cir. 1996). The trial court is "entitled to rely on its own knowledge of attorney's fees in the surrounding area. . . ." Id.
In light of the evidence presented by Siegel and Brown, this Court finds that $425 per hour is an excessive rate for an attorney practicing in Rhode Island Taking into consideration Siegel's extensive experience in labor and employment litigation, as well as the Court's knowledge of prevailing hourly rates, this Court sets $275 per hour as a reasonable rate for Siegel's work in this case.
Reduced Rate
Brown suggests that Siegel's travel time should be compensated at a reduced rate of $80 per hour. Brown further contends that 12.5 hours of time spent on the attorney fee petition should be compensated at the same reduced rate because such work amounts to little more than documenting what Shoucair's counsel has done on his behalf.
Courts have fashioned fee awards to compensate travel time at a reduced rate. Maceira v. Pagan, 698 F.2d 38, 41 (1st Cir. 1983) (allowing compensation for travel time at half the hourly rate of the prevailing attorney). In addition, "[t]ime reasonably expended in connection with fee applications is itself compensable, but, since time spent in this exercise often amounts to little more than `documenting what a lawyer did and why he or she did it,' may fairly be compensated at a reduced rate."Brewster v. Dukakis, 3 F.3d 488, 494 (1st Cir. 1993) (citations omitted). This Court finds that a reduced rate for travel time and work on the fee application is warranted. The Court further finds that a reasonable rate for such non-core time is approximately half of the reasonable hourly rate awarded to lead counsel. Accordingly, the Court sets the rate for Siegel's travel time and time for drafting the fee petition at $140 per hour.
Reasonable Hours
To calculate the reasonable hours expended, the trial court must ascertain the time counsel spent on the case and then subtract "from that figure hours which were duplicative, unproductive, excessive, or otherwise unnecessary." Lipsett v. Blanco, 975 F.2d 934, 937 (1st Cir. 1992). The number of hours "reasonably worked . . . may in some cases be less than the hours actually worked. Maceira v. Pagan, 698 F. 2d 38, 39 (1st Cir. 1983). Counsel must submit to the court contemporaneous time records that constitute a "`full and specific accounting' of the tasks performed, the dates of performance, and the number of hours spent on each task." Weinberger v. Great Northern Nekoosa Corp., 925 F.2d 518, 527 (1st Cir. 1991) (quoting Calhoun v. American Cleveland Corp.,801 F.2d 558, 560 (1st Cir. 1986). Brown argues that certain hours should be excluded from the computation of attorney's fees because they are excessive and unnecessary.
Unnecessary Hours
Brown argues that the 11.6 hours spent on the depositions and trial testimony of Billy Wooten, Leonard Lesko, and James McIlwain should be excluded because their involvement in Shoucair's tenure review was so peripheral that it would be wholly unnecessary to include this time. Brown claims that these witnesses had no information pertaining to any of Shoucair's claims, including the retaliation claim. Brown also requests that this Court exclude a minimum of 10.6 hours for time spent on Sumit Ghosh's deposition and trial testimony, as well as Shoucair's efforts in deposing Dahlila Megherbi. Megherbi was allegedly subjected to the same hostile work environment as Shoucair, but her deposition never went forward. Therefore, Brown contends that any time expended on this issue is unreasonable and should be excluded. Brown further argues that Ghosh also had peripheral involvement in Shoucair's claims, and his testimony was not related to the retaliation claim. Additionally, Brown contends that time spent in the pursuit of an expert witness should be excluded because such witness did not take part in the trial.
Leonard Lesko and Billy Wooten were members of the Faculty Executive Committee. Both testified, inter alia, about discussing concerns over Shoucair's tenure review with Dean Shepp. James McIlwain was on the ad hoc hearing committee. He provided testimony relative to Silverman's effect as well as information on the evidence that was submitted to that committee. Summit Ghosh was a member of the LEMs group during the period when Shoucair alleged that Silverman created a hostile environment. In light of the foregoing and the other evidence presented at trial, the Court does not find that the depositions and trial testimony of these witnesses were unnecessary or unproductive, and therefore, the fee award will not be reduced with respect to same. The award will, however, be reduced by any time spent with "efforts" to depose Dahlila Megherbi. As said deposition apparently did not go forward, Brown should not be accountable for such time. With respect to entries involving an expert witness, the fee award will be reduced for that time because no such witness testified. One of Seigel's entries was for 4.8 and was described as "summarize depositions; contact experts, email Fred." As the Court has no way of determining the amount of time spent on contacting experts, the fee award will be reduced by 4.8.
Travel Time
Brown argues that the 104.2 hours expended by Siegel in travel time are unreasonable noting that four entries show travel in excess of ten hours between California and Rhode Island Brown contends that this Court should set a reasonable travel time of seven hours for a trip between Oakland and Providence and exclude 22.8 hours of travel time. Brown also argues that 22.5 hours spent on travel time between California and Rhode Island for the fee motion hearing is unnecessary because the hearing could have been conducted telephonically.
The Court finds that the travel time requested by Siegel is not excessive. He has sufficiently documented his time by providing his flight itineraries, which in most instances reflect travel time in excess of seven hours. A flight between Oakland and Providence with one stop averages about 9 hours each way.[1] Further, Siegel's requested travel time is not excessive as some of his trips required flights in and out of Boston, an hour from Providence. Additionally, the Court will not reduce Siegel's travel time for the fee petition. Although the petition could have been conducted telephonically, in-person appearances are undeniably more persuasive and effective. Siegel was entitled to appear for the fee petition, his presentation was helpful to the court, and his travel time with respect to the fee petition was not excessive. Accordingly, Siegel may recover for his travel time at the reduced rate set herein for travel, which is $140 dollars per hour.
Inadequate Documentation
Brown further contends that certain hours should be excluded due to inadequate documentation. Brown points to 12 of Siegel's entries, which it claims lack the necessary detail by being abruptly short, not setting forth the division of duties, and not separating time spent on discrete tasks. Brown claims that there are a total of 22.6 hours for which Siegel has failed to provide adequate documentation and therefore requests that this Court apply a fifty percent discount to these hours so that only 11.3 hours will be compensable.
The trial court may reduce attorney's fees when time slips are general in nature; for example, when time slips provide descriptions such as "discovery review," or "phone calls." Martinez v. Hodgson,265 F. Supp. 2d 135, 140 (D. Mass. 2003). Entries "containing only gauzy generalities" are problematic because they prevent the paying party from disputing the "`accuracy of the records as well as the reasonableness of the time spent.'" Lipsett v. Blanco, 975 F.2d 934, 938 (1st Cir. 1992) (citation omitted). Thus, "courts in the First Circuit commonly reduce by fifty percent fee petitions that lack sufficient detail." Martinez, 265 F. Supp. 2d at 141.
Examples of Siegel's entries that Brown urges provide inadequate documentation are "TCs Ghosh, Megherbi; letter Little; email Berg;" "TCs Tsividis, Lardaro, Fred; letter Little"; Arrange Ghosh, Tsividis, Megherbi depositions"; and "Letters Little, Muskian; file review." The Court has reviewed the entries to which Brown objects. With a few notable exceptions, these particular entries pass muster because they identify the task at hand, the date, and the individual with whom Siegel was interacting; therefore, they should not be excluded as inadequate. There are, however, several inadequate entries. As an example, the entry for 3/26/03 provided for 2 hours to "arrange Ghosh, Tsividis, Megherbi depositions." This entry is unacceptable because it does not properly identify a billable task for an attorney. To the extent that "arranging" depositions means scheduling of the same, this would constitute secretarial work. Additionally, the Court has ordered that all time spent on the Megherbi deposition be excluded, yet this entry includes an unspecified amount of time "arranging" the Megherbi deposition. Thus, the entire two hour entry will be excluded. Consistent with this deduction, all of Siegel's entries which contain multiple tasks and refer to Megherbi but fail to specify the time spent on tasks relating only to Megherbi will be excluded. As 14.3 hours worth of time fall into this category, all of those hours will be excluded from the award.[2]
In summary, Siegel will be compensated for the following time. He requests a total of 492.2 hours. His time will be reduced by 14.3 hours for entries relative to Megherbi and 4.8 for an entry involving contacting an expert witness leaving 473.1. The 12.5 hours of time spent preparing the attorney fee petition and all 104.2 hours travel time will be compensated at the reduced rate of $140 per hour. The remaining 356.4 hours of time will be compensated at $275 per hour. In total, this Court awards Siegel $114, 348 for attorney's fees.
Weills' Request for Fees
Anne Weills of California has served as an advisor and co-counsel for Shoucair in this case since May 1996. Her experience as an attorney includes approximately six jury trials and several arbitration hearings. Weills's affidavit sets forth uncontested hourly rates awarded in previous employment and labor related trials, which range form $175 to $250 an hour. Weills's fee agreement with Shoucair established a $150 hourly rate. She is requesting from this Court to be compensated for 473.3 hours at $175 an hour.
Brown argues that Weills should be compensated, if at all, at a substantially reduced rate. Brown contends that Weills's time should be substantially reduced because she had no role as an attorney in this matter, and any supporting role she may have played was duplicative as it could have been assumed by local counsel. Brown also suggests that any time spent on the case before Siegel's involvement — a total of 145.5 hours — should be excluded because she has never entered an appearance. Additionally, Brown argues that any time Weills expended regarding pro hac vice admission — a minimum of 5.3 hours — should be excluded because she never applied for pro hace vice admission. Brown also requests that the time Weills expended in preparation for, and in attendance of, Shoucair's deposition be excluded because her presence was not necessary, and the time is duplicative of the hours requested by Shoucair's then counsel of record, Robert Savage. Brown further argues that because her presence was duplicative and unnecessary the following time after Siegel's involvement should be excluded: 86.1 hours for travel; 39.8 hours in preparation and attendance at depositions in 2003; 110 hours spent at trial; and 1.1 hours spent at a June 23, 2003 meeting at which only one attorney was necessary. Brown submits, however, that if the Court finds that these hours are reasonable, then Weills should be paid no more than $80 per hour, the customary rate for paralegals.
Weills will not be compensated for the 1.1 hours expended at the June 23, 2003 meeting. As it is uncontested that the purpose of the meeting was to hand over documents, the task did not require two attorneys. Since Siegel had also listed the meeting on his time records, this time entry is duplicative and unnecessary because only one attorney was necessary to perform this task. Thus, Weills will not be compensated for this time.
Weills also will not be compensated as an attorney for any work performed in the state because she was not admitted pro hac vice. Rhode Island General Laws provides that "[n]o person, except a member of the bar of this state, whose authority as a member to practice law is in full force and effect, shall practice law in this state. G.L. 1956 § 11-27-2. The practice of law is defined as "the doing of any act for another person usually done by attorneys at law in the course of their profession." Id. Section 11-27-6 prohibits any out-of-state lawyer who practices here without this Court's prior pro hac vice permission from receiving "any pay or compensation, directly or indirectly . . . for any services of a legal nature . . . pertaining to any action or proceeding in any court. . . ." An attorney who lacks pro hac vice status "`may be viewed as being on the same footing as a non-lawyer.'" Martinez,265 F. Supp. 2d at 145 (quoting The Nationalist Movement v. Boston,
1999 U.S. App. LEXIS 21377, *2 (1st Cir. 1999) (unpublished decision).
Weills will be compensated for any work she did in Rhode Island at the rate established for non-lawyers, $80 per hour. Her entries for any work performed here will not be excluded, as Brown suggests they should be, because Weills clearly played an integral role during the preparation and course of the trial. Due to the time constraints between Siegel's initial involvement in the case and the time for trial, she spent a considerable amount of time assisting lead counsel and briefing the facts. Her efforts were also not duplicative because there was insufficient time for local counsel to become fully cognizant of such a fact-intensive and complicated case in the brief time before trial. Consequently, Weills's presence in court was necessary and non-duplicative. Accordingly, this Court finds the following reasonable hours will be compensated at the reduced rate of $80 per hour: 21.2 hours spent in Providence for Shoucair's deposition in April 1999; 86.1 hours for travel; 39.1 hours for attendance of depositions in 2003; 121 hours spent in Providence for the trial. This amounts to $21,392.
The remaining 204.8 hours for work performed while in California will be compensated at a reasonable rate for an attorney. The 5.3 hours spent on a pro hac vice petition that was never filed will be subtracted bringing her hours to 199.2. Although she was not admitted pro hac vice here, any work she did outside the state should be compensated because she played a major role in moving the case forward. After two local counsel withdrew from the case, she expended great effort in searching for a replacement attorney. She has also advised Shoucair throughout the matter. Weills requests an hourly rate of $175 per hour, which the Court finds to be reasonable. Thus Weills' rate for work in California is set at $175.[3]
In sum, Weills will be awarded $21,392 for her work done inside the state and $34, 860 for her work done outside the state. Thus the total award for Weills is $56, 256.
Berg's Request for Fees
Andrew Berg has served as local counsel on this case since January 2003. He has served as lead counsel in a number of trials and evidentiary hearings. He currently bills clients between $180 and $220 per hour. In the instant case, he is requesting to be compensated for 137.7 hours at $220 per hour. Brown suggests that Berg should be compensated at $125 per hour.
Brown argues that Berg's hours must be reduced by 9.5 hours to exclude the unnecessary time spent on the Ghosh and Megherbi depositions. Brown further contends that the 0.6 hours spent searching for an expert witness should be excluded because no expert witness testified on Shoucair's behalf. Brown also argues that the 0.6 hours of research on punitive damages, which is preceded by the abbreviation CAS, should be excluded as that abbreviation appears to refer to time expended by another attorney. Moreover, Brown requests that the 4.8 hours spent on the attorney fee petition should be compensated at the reduced rate of $80 per hour. Brown also requests that the 0.5 hours spent picking up audiotapes should be compensated at the reduced rate as well because it is a task that could have been performed by a paralegal or secretary.
Berg's request to be compensated at $220 per hour is excessive considering he served only as local counsel in this matter. Taking into consideration Berg's familiarity with Shoucair's case, his level of experience, and the fact that he served solely as local counsel, the Court finds that an appropriate rate for his time should be $150 per hour. As discussed in the computation of Siegel's fee award, the amount of time spent on the Ghosh deposition will be compensated. However, the time spent on the Megherbi deposition, which did not proceed, will not be included in the fee calculation. Berg submitted an entry dated 3/26/03 of 1.2 hour for "draft of motions, Orders, and depo notices for Ghosh and Megherbi depositions." As this entry does not provide the specific time spent with respect to Megherbi, the entire entry will be subtracted. Additionally, Berg's time will also be reduced by .7 for entries on 4/3/03 (.2), 4/25/03 (.3) and 4/30/03 (.2) as these entries reflect time on the Megherbi deposition. Similarly, Berg will not be compensated .6 hours for searching for an expert witness as no witness testified. Berg will not be compensated for the 0.6 hours spent researching punitive damages because the entry is preceded by the initials CAS, perhaps indicating that his partner, Catherine A. Sammartino, performed the research. Berg cannot be compensated for work that he did not complete.
Berg will be compensated at the reduced rate of $80 per hour for the attorney fee petition for the reasons discussed previously. Additionally, that reduced rate will also apply to the 0.5 hours spent picking up the audiotapes. "[C]lerical or secretarial tasks ought not to be billed at lawyer's rates, even if a lawyer performs them." Lipsett,975 F.2d at 940. Picking up audiotapes is a clerical or secretarial task; therefore it will be billed at the reduced rate.
The Court finds that Berg expended 137.7 hours on this case. Of that time, 3.1 hours will be reduced bring the number to 134.6. The reduced rate of $80 will be applies to 5.3 hours. The remaining hours will be compensated at $150. The total award to Berg is $19, 819.
Savage's Request for Fees
Robert Savage served as Shoucair's counsel from July 1995 until January 2002. Savage has concentrated his practice in labor and employment issues for approximately 13 years. He is requesting to be compensated for 85.34 hours at the following rates: $130 per hour for work performed in 1996 and 1997; $150 per hour for work performed in 1998 and 1999; and $190 per hour for work performed from 2000 to the present.
Brown requests that certain hours claimed by Savage be excluded as excessive and unnecessary based on Siegel's and Weill's indications that Savage performed little to no work to prepare for this trial. Brown specifically requests that the Court reduce the hours that Savage expended drafting the complaint and the request for production of documents by fifty percent and that he be compensated at rates of $130 and $150 per hour, respectively, for those tasks. Brown further suggests that Savage be compensated at the reduced rate of $80 per hour for time spent traveling to mail the complaint (0.17 hours), a task that could have been performed by a paralegal or secretary.
Savage requests to be compensated at a rate of $190 per hour for work performed from 2000 to the present; however, this rate is clearly excessive compared to those rates awarded to Shoucair's current counsel. In light of Savage's inability to keep the case moving forward, Savage is reasonably entitled to no more than $150 per hour for any work he performed. Savage will be compensated at $130 per hour for work performed through 1997 and $150 thereafter.
Work that can be performed by a paralegal or secretary should be compensated at a reduced rate. Lipsett, 975 F.2d at 940. Accordingly, Savage's time for mailing a complaint, will be compensated at $80 per hour. Savage's time records also reflect that he spent 26.9 hours preparing the complaint and amended complaint. The Court finds Savage's time on these pleadings too excessive. Accordingly, his time on these tasks, at the rate of $130, will be reduced by 13.67 hours. This Court further finds that 22.82 hours for document production to be excessive; therefore, the time will be reduced by 11.49 hours. Savage will be compensated for 20.14 hours at $130, 40.2 hours at $150, and .17 hours at $80. His total award is $8,661.8.
 COSTS
Attorneys Dan Siegel and Andrew Berg also request costs in the amount of $26,911.57 and $504.87, respectively. FEPA provides that the court may grant the prevailing party litigation expenses. § 28-5-24 (3). It is well settled that in awarding fees "`reasonable and necessary costs and expenses'" may be reimbursed. In re Boston and Maine Corp. v. Moore,776 F.2d 2, 11 (1st Cir. 1985) (quoting Palmigliano v. Garrahy,707 F.2d 636, 637 (1st Cir. 1983)).
Failure to Provide Documentation
Brown objects to the $504.87 in costs requested by Andrew Berg because he failed to provide any documentation for such costs. Brown also objects to a number of costs requested by Dan Siegel. Brown first disputes the $367.32 in costs for document production to Brown because receipts are provided for only $79.82 of this charge. Brown also objects to the costs associated with shipping Shoucair's files to Rhode Island because no receipts were provided for the shipping costs.
This Court will not reimburse for inadequately documented costs. Accordingly, neither Berg nor Siegel will be reimbursed for costs which they failed to properly document. This Court does not have any documentation associated with Berg's total request of $504.87; therefore, his request for costs is denied. Siegel failed to provide documentation for $367.32 in costs for document production and $161.68 to ship files to Rhode Island; therefore, Siegel's award for costs shall be reduced by $529.
Travel Expenses
 Airfare and Hotel
Brown further contends that it should not be required to pay airfare or hotel costs for Shoucair to attend his own deposition in 1999. The Court agrees. Travel expenses for attorneys are generally reimbursable; however, the travel expenses that the litigant incurs should not be reimbursed because "the expense of a litigant's travel does not appear on an attorney's bill." Calderon v. Witvoet, 112 F.3d 275, 276 (7th Cir. 1997) (holding in a Fair Labor Standards case that a litigant's costs for travel to trial were not to be reimbursed). This Court finds that Shoucair is responsible for his own travel expenses. Accordingly, Siegel will not be reimbursed for $485 for Shoucair's airfare and $167.45 for his hotel expenses, a total of $652.45.
Brown also objects to Weills's airfare and hotel costs associated with the 1999 depositions. Brown also argues that Weills's airfare to attend the 2003 depositions should be excluded because her presence at the depositions was unnecessary. Brown objects to Weills's airfare to attend the depositions in Providence from March 30 to April 3, 2003, given her failure to seek pro hac vice admission. Brown also seeks to exclude the cost of Weills's airfare to Providence for the trial for the same reason.
The Court has found that Weills was an essential component of the Plaintiff's team. Further, her presence for the aforementioned litigation activities was vital given her familiarity with the facts of the case. As the Court has granted her request for attorney's fees, albeit at a reduced rate for paralegals, the Court also grants her request for costs associated with travel.
Brown also objects to some of the airfare costs to attend the trial. Brown requests a $381.50 credit for the return ticket not used by Siegel and a $194.25 credit for the return ticket not used by Weills. The Court will not "credit" or reduce the total costs in this instance as Shoucair's attorneys were required to stay in Providence longer than expected.
Brown further objects to any travel expenses associated with the attorney fee hearing on the ground that the hearing could have been performed telephonically. In previously addressing Brown's contention that Siegel's travel time for the fee hearing should be denied, the Court specifically found that Siegel was entitled to be here for the fee hearing and that his presence inperson was of assistance to the Court. As the Court has allowed his travel time (at a reduced rate), the Court also grants his request for travel expenses associated with the fee hearing.
Car Rental
Brown objects to costs for Siegel's car rental while he was in Providence for depositions, hearings, and trial. Brown contends that the rental car was unnecessary because the depositions, hearing and trial were held in Providence while Siegel was staying at hotels in Providence, all within walking distance from the hotel. This Court agrees with Brown's assertion that Siegel should not be reimbursed for the rental car while in Providence for depositions and hearings because they were within walking distance from the hotel. However, the trial required Siegel to bring boxes of documents into court; therefore, the use of a rental car was reasonable. Accordingly, he will not be reimbursed for the following costs: $360 while in Providence for depositions from March 9 to 16, 2003; $308.33 while in Providence from March 30 to April 3, 2003; $190.66 while in Providence for the reinstatement hearing; and $280 while in Providence for the fee motion hearing.
Brown further contends that $428.75 must be deducted from the parking and fuel costs associated with the rental car used during the trial because there is no supporting documentation. As discussed herein, Siegel will not be reimbursed for any costs that were improperly documented. As the $428.75 in parking and fuel costs was documented by handwritten notes and not receipts, said sum will be deducted from the award of litigation expenses.
Miscellaneous Travel Expenses
Brown also disputes $44.66 that was spent on food and movies and was reflected on Siegel's hotel bill during the 2003 deposition. The Court finds Brown's position to be reasonable; therefore the award will be reduced by this amount.
Deposition Costs
Brown requests a fifty percent discount for the costs amounting to $2,224 incurred during the March 2003 depositions based on Shoucair's failure to provide individual receipts for each deposition. Brown contends that certain depositions were unnecessary and objects to being charged for these costs. Brown also objects to any costs associated with Sumit Ghosh's deposition. Brown claims that Ghosh had peripheral involvement in the issues raised by Shoucair; therefore, his deposition was unnecessary. Brown further objects to any costs related to Dahlila Megherbi's deposition, asserting that the attempts to depose her were unnecessary because she did not have information relevant to Shoucair's claims. Moreover, Brown notes that her deposition never went forward.
Given that individual receipts for the 2003 depositions have not been submitted, the Court will reduce the reimbursement amount by 50% to $1,112. As with this Court's previous rulings, costs relative to the Ghosh deposition will be reimbursed; however, costs for the Megherbi deposition, which did not proceed, are denied. Accordingly, $693.10 in costs with respect to the Megherbi subpoena and deposition cancellation fee will be excluded from the award as well as $1,112 from the 2003 depositions.
Out of State Attorney's Fees
Siegel also requests compensation for costs he incurred in contacting out of state attorneys. Siegel provides invoices from Greenbaum, Rowe, Smith, Ravin, Davis Himmel LLP of New Jersey in the amount of $2,717 to subpoena Ghosh and from Hiatt Hoke, LLP of Massachusetts in the amount of $440 to subpoena Megherbi. Brown contends that it should not be responsible for these costs because they are duplicative of costs in the attorney fee petition; further, these firms did not provide the Court with an affidavit requesting these fees.
The Court disagrees with Brown's contentions. These costs do not appear to be duplicative. Further, Siegel's affidavit and the invoices provide adequate documentation. Nevertheless, the Court has previously excluded all time and costs associated with the Megherbi deposition. As such, the Court declines to award out-of-state attorneys fees with respect to Megherbi. Thus, said costs will be reduced by $440.
Miscellaneous Costs
Brown objects to the charge of $107.47 for Lexis/Nexis charges, asserting that courts view computer research as an item properly attributed to firm overhead. Courts have "customarily disallowed or reduced certain expenses including computerized legal research, copying, telephone calls, postage and travel. . . ." Weinberger v. Great NorthernNekoosa Corp., 801 F. Supp. 804, 827 (D. Me. 1992) (declining to permit reimbursement for computer research, finding it attributed to firm overhead). Accordingly, this Court will not permit Siegel to be reimbursed for the Lexis/Nexis research.
Brown further objects to the $19.82 cost for mailing to an expert who never testified because there is no reasonable basis upon which this cost could be justified. The Court has declined to award for time associated with the expert who did not appear. Therefore, costs for sending mail to the expert will also not be awarded.
In sum, the request for litigation costs will be reduced by $5, 038. The Court awards $21, 872.71 in costs.
 CONCLUSION
For all the reasons stated herein the Court holds as follows:
 (1) the motion for judgment as a matter of law is denied;
 (2) the motion for new trial is denied;
 (3) the motion to strike the punitive damage award is denied;
 (4) the motion to strike the compensatory damage award is denied;
 (5) the motion to strike the back pay is denied AND the back pay award is to be reduced by 30%;
 (6) the motion for reinstatement is denied;
 (7) the motion for front pay is denied;
 (8) the motion for fees and costs is granted subject to the deductions outlined herein.
The parties shall submit an Order to enter.
[1] This figure is based on an orbitz.com search for flights between Oakland and Providence.
[2] See 3/17/03 (2 hours), 3/26/03 (2 hours), 4/29/03 (4 hours), 5/7/03 (3.8 hours), 5/17/03 (2 hours).
[3] Although an early retainer agreement with Shoucair set her hourly rate at $150, the agreement was later revised to include for contingent fees. The Court finds that $175 is a fair and appropriate hourly rate for Weills.